## ENTERPRISE SAV. ASS'N v. ZUMSTEIN, Postmaster.

(Circuit Court, S. D. Ohio, W. D. November 10, 1894.)

LOTTERIES — USE OF MAILS—PROHIBITION BY POSTMASTER GENERAL — DISCRE- TION—CONTROL BY COURTS.

Rev. St. § 396, makes it the duty of the postmaster general to instruct all persons in the postal service with reference to their duties, etc. Sections 3929 and 4041 provide that the postmaster general may, "upon evidence satisfactory to him" that any person is conducting a lottery, etc., or any scheme for obtaining money through the mails by false pre- tenses, instruct postmasters to mark "fraudulent" and return registered letters, directed to such person, to the postmasters at the offices at which they were mailed, to be returned to the writers thereof; and may forbid the payment by any postmaster to any such person of any postal money drawn to his order or in his favor. *Held*, that the discretion of the postmaster general in respect to the matters referred to in such statutes cannot be supervised or controlled by the federal courts.

This was a bill by the Enterprise Savings Association against John Zumstein, postmaster of the city of Cincinnati, Ohio, for an in- junction. Defendant demurred to the bill.

Chas. W. Baker and Michael G. Heintz, for complainant.
Harlow Cleveland, U. S. Atty., for defendant.

SAGE, District Judge. The bill sets forth the articles of incorpo- ration, by-laws, and plan of business of the complainant, which issues certificates "in blocks of three," the purchaser paying for each cer- tificate, in cash, the sum of $15,—that is to say, $5 for each cer- tificate,—at the time of their issuance and delivery to him. By the terms of the contract of the certificate, it is paid up in full by monthly payments in 5 years and 5 months from its date, the full amount being $100. Thereupon the holder receives a paid-up cer- tificate in lieu of the original contract certificate, and is released from any further payments, the association agreeing to redeem the same not later than 120 months from the date of the original con- tract certificate. The holder meantime is to receive interest at 6 per cent. per annum, and finally the principal, together with his share of such profits as in the meantime have been made by the as- sociation. The initial payment of $5 on each certificate, or $15 on each block of certificates, is applied to the establishment and sup- port of agencies and of canvassing, and the payment of incidental expenses. Of the $1.50 required to be paid each month succeeding the first month, $1 is paid into what is known as the "maturity fund," out of which the certificates maturing are paid. Twenty-five cents goes to the maintenance of the general expenses of the company, and the other twenty-five cents to the reserve fund. This is, in short, the published scheme of the company. A maturity table is prepared and employed, which begins with the certificates, which are num- bered, with the lowest numbered certificates then in force, begin- ning with number 1, and proceeding by multiples of three of the live certificates. The bill sets forth that since the complainant be- gan doing business, which was shortly after its incorporation, on the 26th of April, 1894, it has issued 1,524 certificates. On the last day of July, 1894, there were 995 certificates not lapsed, matured, or for-

feited, while up to that time 1,500 certificates had been issued. The complainant was created and organized under the laws of the state of West Virginia. It opened an office in the city of Cincinnati almost immediately after its incorporation, and has maintained it ever since.

The complaint of the bill is that the defendant, being postmaster of the city of Cincinnati, arbitrarily, illegally, and without right, has undertaken to interfere with, stop, and prevent the employment and the use by the complainant of the mails and the registry department of the post-office department of the post office of the city of Cincinnati, and that the defendant bases his action in such interference and denial to complainant of the postal facilities of the post office of the city of Cincinnati, upon an order received by him from the postmaster general of the United States, under date March 31, 1894, which the defendant has exhibited to the complainant, and which the defendant·makes as his excuse for his action aforesaid. The order is as follows:

"Order No. 100.

"It having been made to appear to the satisfaction of the postmaster general that the Enterprise Savings Association, S. A. Stevens, Pres., J. C. Groene, Vice Pres., W. R. Sypher, Treas., C. K. Ebann, Secy., J. S. Munsell, Genl. Manager at No. 610 Neave Building, Cincinnati, O., are engaged in conducting a lottery or similar enterprise for the distribution of money or personal property by lot or chance through the mails, in violation of the provisions of section 3894, Revised Statutes of the United States, as amended:

"Now, therefore, by authority vested in the postmaster general by sections 3929 and 4041, Revised Statutes of the United States, and by act approved Sept. 19, 1890, I do forbid the payment by the postmaster at Cincinnati, O., of any postal order drawn to the order of said company and its officers aforesaid, and that the said postmaster is hereby directed to inform the remitter of said postal money order that payment thereof has been forbidden, and that the sum of said money order will be returned upon presentation of a duplicate money order applied for and obtained under the regulations of the department.

"And, upon the same evidence, the postmaster at Cincinnati, O., aforesaid, is hereby instructed to return all registered letters which shall arrive at his office, directed to the said company and its officers aforesaid, to the postmasters at the offices at which they were originally mailed, with the word 'Fraudulent' plainly written or stamped upon the outside of such letters.

"[Signed]                                    W. S. Bissell, Postmaster General.

"To Postmaster, Cincinnati, O."

The bill then specifies instances of the defendant's refusal to recognize or pay postal money orders in favor of and presented by the complainant, and instances of his refusal to deliver registered letters received in said post office, and addressed to the complainant, charging that said letters were stamped with the word "Fraudulent" across the envelopes, and returned to the post offices from which they were sent. The prayer is for an injunction prohibiting the defendant from interfering with the employment of the post office of Cincinnati in the conduct of complainant's business, and from withholding registered letters received and addressed and directed to the defendant, and from withholding payment of money orders addressed to and received by him. The defendant has filed a general demurrer for insufficiency.

Section 396 of the Revised Statutes makes it the duty of the postmaster general to instruct all persons in the postal service with reference to their duty, and to superintend generally the business of the department, and execute all laws relative to the postal service.

Section 3834 requires every postmaster, before entering upon the duties of his office, to give bond for the faithful discharge of all duties imposed on him either by law or the rules and regulations of the department. This section subjects the postmaster to the orders of the postmaster general.

Section 3926 authorizes the postmaster to establish a uniform system of registration for the greater security of valuable mail matter. It provides that neither the post-office department nor its revenue shall be liable for the loss of any mail matter on account of its having been registered.

Section 4027 authorizes the postmaster to establish and maintain, under such rules and regulations as he may deem expedient, a uniform money-order system at all suitable post offices, which shall be designated as "money-order offices." This authorization, it is expressed in the section, is to promote public convenience, and to insure greater security in the transfer of money through the mail.

Sections 3929 and 4041 read as follows:

"Sec. 3929. The postmaster general may, upon evidence satisfactory to him that any person is engaged in conducting any fraudulent lottery, gift-enterprise, or scheme for the distribution of money or of any real or personal property, by lot, chance or drawing of any kind, or in conducting any scheme or device for obtaining money through the mails by means of false or fraudulent pretenses, representations or promises, instruct postmasters at any post office at which registered letters arrive, directed to any such persons, to return all such registered letters to the postmasters at the offices at which they were originally mailed, with the word 'Fraudulent' plainly written or stamped upon the outside of such letters; and all such letters so returned to such postmasters shall be by them returned to the writers thereof, under such regulations as the postmaster general may prescribe. But nothing contained in this title shall be so construed as to authorize any postmaster or other person to open any letter not addressed to himself."

"Sec. 4041. The postmaster general may, upon evidence satisfactory to him that any person is engaged in conducting any fraudulent lottery, gift-enterprise, or scheme for the distribution of money, by lot, chance, or drawing of any kind, or in conducting any other scheme or device for obtaining money through the mails by means of false or fraudulent pretenses, representations, or promises, forbid the payment by any postmaster, to any such person of any postal money drawn to his order or in his favor, and may provide by regulations for the return, to the remitter, of the sums named in such money orders. But this shall not authorize any person to open any letter not addressed to himself."

The sections above cited and quoted vest in the postmaster general complete control and authority over the money-order and registered letter department of the postal service. They make every postmaster subject to his orders. They also vest in him a discretion, "upon evidence satisfactory to him" that any person is conducting any fraudulent lottery, gift enterprise, or scheme for the distribution of money, or of any real or personal property by lot, chance, or drawing of any kind, or in conducting any other scheme or device for obtaining money through the mails by means of false or fraudulent

pretenses, representations, or promises, to instruct postmasters at any post office at which registered letters arrive, directed to such person, to return such letters to the postmasters at the offices at which they were mailed, after writing or stamping upon the outside of such letters the word "Fraudulent;" and all such letters, when so returned, are to be delivered to the writers thereof, under such regulations as the postmaster general may prescribe. The payment of postal money orders drawn to the order of or in favor of any such person may be forbidden by the postmaster general upon evidence satisfactory to him that any person is engaged in conducting any fraudulent lottery, gift enterprise, or scheme as above set forth; and the postmaster general may provide for the return to the remitter of the sums named in such money orders. No citizen has a vested right to the use either of the registered letter or postal money order system. Every citizen has the privilege of both, subject to the discretion which is vested in the postmaster general. It is the duty of every postmaster to obey the orders of the postmaster general, made in pursuance of the statutory provisions above quoted, and in the exercise of his discretion. The question then is whether this discretion can be supervised or controlled by federal courts. It is not a new question. It was first considered in the case of Marbury v. Madison, 1 Cranch, 137. In that case, at page 166, the supreme court was of opinion that the president is vested with certain political power, to be exercised in his own discretion. Whatever opinion might be entertained of the manner in which that discretion was used, there existed and could exist no power to control it.

It has been repeatedly held by the supreme court that a mandamus will not lie to the head of a department to enforce the performance of an executive duty involving the exercise of judgment or discretion. See Bank v. Paulding, 14 Pet. 497; Brashear v. Mason, 6 How. 92; U. S. v. Seaman, 17 How. 225; Gaines v. Thompson, 7 Wall. 347. In Gaines v. Thompson it was held that the act of the secretary of the interior and of the commissioner of the land office in canceling an entry for land is not a ministerial duty, but is a matter resting in the judgment and discretion of those officers, as representing the executive department; and that the court would not interfere by injunction more than by mandamus to control it. Mr. Justice Miller, in delivering the opinion of the court, reviews the cases from Marbury v. Madison down. A ministerial duty was defined in Mississippi v. Johnson, 4 Wall. 475, as one in respect to which nothing is left to discretion. In Gaines v. Thompson the court held that an officer to whom public duties are confided by law is not subject to the control of the courts in the exercise of the judgment and discretion with which he is vested by law. The reason given by the court is that the law reposes the discretion in the officer, and not in the courts.

To the same effect are U. S. v. Black, 128 U. S. 40, 9 Sup. Ct. 12, and U. S. v. Windom, 137 U. S. 636, 11 Sup. Ct. 197.

In the case now before the court, the postmaster general was authorized to act upon evidence satisfactory to him. What he did under that authorization cannot be regarded as a ministerial act.

It was in the exercise of a discretion, and it cannot be supervised or controlled by this court.

The demurrer will be sustained, and the bill dismissed, at the cost of the complainant.