## MISSOURI DRUG CO. v. WYMAN.

### (Circuit Court, E. D. Missouri, E. D.   May 9, 1904.)

1. MAILS—FRAUDULENT USE—STATUTES—CONSTITUTIONAL LAW.

   Rev. St. §§ 3929, 4041 [U. S. Comp. St. 1901, pp. 2686, 2749], and Act March 2, 1895, c. 191, § 4, 28 Stat. 964 [U. S. Comp. St. 1901, p. 2688], giving the Postmaster General authority to prevent the use of the mails by persons engaged in use thereof to conduct fraudulent schemes or to sell goods by false pretenses, are not unconstitutional, since, as the right to use the mails is a statutory privilege only, its withdrawal is not a deprivation of property without due process of law.

2. SAME—POSTAL REGULATIONS.

   Under the plenary power conferred on Congress to establish and regulate the postal system, it may lawfully confer on the Postmaster General authority to prevent the mails being used as a medium to disseminate printed matter which, on grounds of public policy, has been declared nonmailable.

3. SAME—POST-OFFICE DEPARTMENT—JURISDICTION.

   Congress having declared that certain kinds of printed matter shall be nonmailable, and that the mails shall not be used to accomplish fraudulent schemes, whether certain mail matter belongs to the prohibited class, or whether a person is in fact making a fraudulent use of the mails, is within the jurisdiction of the executive branch of the government, the determination of which is not reviewable by the courts if sustained by any credible evidence.

4. SAME—MEDICAL REMEDIES—FRAUDULENT ADVERTISING—OPINIONS—PUFFING.

   A drug company advertised "Vitality Pills" by printed matter sent through the mails, representing itself as an expert, and that the pills had been the result of long medical research, made from an animal extract taken from healthy young bulls; that they were a positive cure for all nervous and sexual diseases where epilepsy or insanity had not already set in, would enlarge the sexual organs, etc., and were the only known positive cure for lost manhood, etc. These statements were false, the only medicinal value of the pills being certain old and well-known drugs possessing some tonic properties. *Held*, that such representations were misrepresentations of fact and of alleged expert knowledge, authorizing a fraud order issued by the Post-Office Department, and not mere statements of opinion and laudatory statements used in advertising.

## On Petition for Injunction.

On November 3, 1903, the Acting Assistant Attorney General for the Post-Office Department at Washington, D. C., notified the Missouri Drug Company, doing business in the city of St. Louis, Mo., that charges had been lodged with the Postmaster General against the drug company to the effect that it was engaged in conducting a scheme or device for obtaining money through the mails by means of false and fraudulent representations or promises, in violation of sections 3929 and 4041 of the Revised Statutes of the United States [U. S. Comp. St. 1901, pp. 2686, 2749]; that a statement of the nature of the charges was inclosed with the notice; and that it was desired that the drug company make a reply to the charges on November 18, 1903. On the day appointed for the hearing before the Acting Assistant Attorney General for the Post-Office Department the drug company appeared by its president, and filed a written reply to the charges of some length. In its reply it set out with considerable detail its method and manner of doing business, and insisted, in substance, that it was not engaged in obtaining patronage for the medicines which it was engaged in selling by means of false and fraudulent representa-

¶ 1. Nonmailable matter in furtherance of fraud, see note to Timmons v. United States, 30 C. C. A. 86.

tions, but was transacting its business in a lawful manner. Subsequent to the hearing, and on December 7, 1903, the drug company was advised, in substance, that all the evidence in the case had been carefully considered by the Post-Office Department, and that it had been decided "that that part of the company's business which relates to the cure for lost manhood is in violation of the postal fraud laws." It was further advised that it was "not the desire of the Post-Office Department to interfere with any legitimate business (of the drug company), but to suppress that part which relates to the cure for lost manhood," and that it had been decided to give the company an opportunity to discontinue the objectionable branch of its business by signing an affidavit that it had entirely discontinued and abandoned the sale of its "Vitality Pills," and all other business connected with its cure for lost manhood, with the exception of completing the treatment of patrons who had actually ordered "Vitality Pills" at the time of the signing of the affidavit. On receipt of this communication the drug company, under date of December 17, 1903, filed an affidavit to the effect that it had ordered the immediate discontinuance of all public advertising in the newspapers and magazines of a cure for lost manhood known as "Vitality Pills," and that it had stopped the use of the mails for the shipment of "Vitality Pills," except in fulfillment of promises made previous to the signing of the affidavit. Subsequently the Post-Office Department appears to have been advised that, notwithstanding the statement contained in the affidavit of December 17, 1903, the drug company was using the mails for the purpose of distributing "Vitality Pills," whereupon, under date of February 15, 1904, a fraud order was issued by the Postmaster General, known as "Order No. 126." This order recited, in substance, that it had been made to appear to the Postmaster General, upon evidence satisfactory to him, that the Missouri Drug Company, its officers and agents, at St. Louis, Mo., was engaged in conducting a scheme or device for obtaining money through the mails by means of false and fraudulent pretenses, representations, and promises, in violation of the act of Congress entitled "An act to amend certain sections of the Revised Statutes relating to lotteries and for other purposes," approved September 19, 1890, 26 Stat. 465, c. 908 [U. S. Comp. St. 1901, p. 2659]. Whereupon the postmaster at St. Louis, Mo., was forbidden to pay any postal money orders payable to the order of the Missouri Drug Company, and to inform persons transmitting such postal money orders that payment thereof had been forbidden, and that the amount would be returned upon presentation of the original order, or a duplicate thereof, which should be applied for and obtained under the regulations of the department. The postmaster at St. Louis, Mo., was further ordered to return all letters, whether registered or not, and other mail matter, which should arrive at his office directed to said Missouri Drug Company, to the postmasters at the offices at which such mail matter was originally received, with the word "Fraudulent" plainly written or stamped upon the outside of such letters or other mail matter; and that, where there was nothing on such letters to indicate who were the senders, to cause such letters to be sent to the dead letter office, with the word "Fraudulent" plainly written or stamped thereon, to be disposed of as other dead matter under the laws and regulations applicable thereto. After the issuance of this order, and on March 2, 1904, the drug company filed its bill of complaint against Frank Wyman, postmaster in the city of St. Louis, praying for an injunction perpetually enjoining and restraining him and his employés from obeying such order of the Postmaster General, and from interfering with the complainant's mail matter in any respect. The bill of complaint alleged, in substance, and as a ground of relief, that it had been for some time past engaged in the business of healing diseases and ailments of the human family, and more particularly those diseases and ailments which affected the nervous and sexual organs; that it had expended large sums of money in advertising its remedies for such ailments, and had created a large demand for its remedies throughout the United States; that said business was a legal and legitimate business, conducted according to legal and business methods, and was founded solely on the medicinal virtues of the remedies which it was engaged in selling; that its remedies were capable of cure, and had cured many ailments of the nervous and sexual organs; that sections 3929 and 4041 of the Revised Statutes of the United States [U. S. Comp. St. 1901, pp. 2686, 2749] have no applica-

tion whatever to the business in which the complainant was engaged, and that said business was legitimate, and that no fraud, deceit, deception, or misrepresentation of any kind had ever been practiced by it. On the presentation of the bill of complaint an order was entered requiring the postmaster at St. Louis to appear on a certain day and show cause why a temporary injunction such as was prayed for in the bill should not be granted. In obedience to the rule to show cause a return was made by the postmaster, in which return it was alleged, amongst other things, that at the time said fraud order was issued, and for a long time prior thereto, the complainant had been engaged in a scheme by it devised to defraud divers persons throughout the United States, which scheme was to be effected through the use and by means of the post-office establishment of the United States. On the hearing of the application for a preliminary injunction the court made an order restraining the postmaster, during the pendency of the cause, and until a final hearing, from executing so much of the order of the Postmaster General as required him to return mail matter addressed to the complainant to the senders thereof and branding it fraudulent. At the same time, by consent of the complainant and the defendant, an order was made directing that the cause be speeded to a final determination, that the time be shortened for the taking of such testimony as the parties desired to submit, and that when such testimony was taken the cause be submitted to the court for such final decree as it thought proper to enter. The defendant thereafter filed an answer to the bill of complaint. In the answer so filed the defendant in substance repeats the allegations contained in his return to the rule to show cause, that when the fraud order was issued the complainant was, and for a long time prior thereto had been, engaged in a scheme and artifice to defraud divers persons resident in the United States by means and by use of the post-office establishment. The nature of such fraudulent scheme was also stated with some detail in the answer. In pursuance of the permission given to the parties to take such testimony as they desired to take, considerable testimony has been taken by the complainant, and the cause has been submitted to the court for final decree upon such testimony, the defendant declining to take any testimony in his own behalf.

Ashley C. Clover and James H. Harkless, for complainant.
David P. Dyer, U. S. Dist. Atty., for respondent.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Regarding the proposition which was advanced on the hearing that the statutes under which the Postmaster General assumed to act in issuing the fraud order, to wit, sections 3929 and 4041 of the Revised Statutes [U. S. Comp. St. 1901, pp. 2686, 2749], and section 4 of chapter 191 of the act of March 2, 1895 (28 Stat. 964 [U. S. Comp. St. 1901, p. 2688]), are unconstitutional, it is sufficient to say that the court adheres to the views which it expressed on that point in the case entitled American School of Magnetic Healing v. McAnnulty (C. C.) 102 Fed. 565, and to the views previously expressed by the Circuit Court of Appeals for the Sixth Circuit in Enterprise Savings Ass'n v. Zumstein, 15 C. C. A. 153, 67 Fed. 1000, and by the Supreme Court of the District of Columbia in Dauphin v. Key, 4 MacArthur, 203. In other words, the court holds that, in virtue of the plenary power conferred upon the Congress of the United States to establish a postal system and make regulations for its government and control, it may lawfully declare what shall and what shall not be carried in the mails, and may lawfully confer on the Postmaster General the requisite authority to prevent the mails from being used as a medium to disseminate printed matter which, on grounds of public policy, it has declared to be nonmailable. When Congress declares, as it has an undoubted right to

do, that a certain kind of printed matter shall not be deposited in the mail, or that the mails shall not be used by any person or corporation to accomplish fraudulent schemes, the duty of determining whether certain mail matter belongs to the prohibited class or whether a certain person is in fact making use of the mails to accomplish a scheme to defraud, are questions which can be decided most conveniently by those who are charged with the administration of the postal laws. The determination of such questions is, in its nature, an executive function. It frequently happens that officers who are charged with the execution of the laws are compelled to exercise some measure of judgment and discretion, and to determine, to the best of their ability, questions both of law and fact on which the proper execution of the law depends. No reason is perceived, therefore, why Congress could not lawfully vest the Postmaster General with authority to inquire and determine whether any person or corporation was using the mails to consummate a scheme to defraud after it had determined that the mails should not be used for that purpose. Indeed, it would seem that the power in question could not well have been lodged elsewhere than with the head of the Post-Office Department, whose duty it is to see that the postal laws are in all respects faithfully executed, and that the privilege accorded to citizens of using the mails is not abused. The statutes in question operate equally upon all persons. They do not deprive any one individual or class of individuals of a privilege which is accorded to others, nor do they take away from the citizen any right which is guarantied to him by the federal Constitution. The right to use the mails is a mere privilege conferred by legislative enactment, and it must always be exercised under and subject to such conditions and restrictions as Congress sees fit to impose. Sections 3929 and 4041 [pages 2686, 2749], now under consideration, appear to have been enacted for no other purpose than to vest the Postmaster General with the power to effectually prevent the mails from being used as a means of disseminating printed matter which was deemed harmful to the public, and which Congress for that reason had declared should not be so disseminated.

The bill of complaint contains an allegation, in substance, that the sections of the Revised Statutes last mentioned have no application to such a business as the complainant is engaged in transacting, and it is on this ground that the drug company principally relies to obtain injunctive relief. In support of this contention it asserts that all the representations made by it to induce people to purchase its "Vitality Pills" were matters of opinion, and, being of that character, that persons who purchased on the strength thereof cannot be said to have been defrauded. It further insists that because all of the fraudulent representations that were relied upon to prove the existence of a scheme to defraud were mere expressions of opinion, they could not, as a matter of law, accomplish a fraud; and that the Postmaster General had no jurisdiction to find that the drug company was engaged in a scheme to defraud, and on the strength of that finding deprive it of the privilege of using the mails. This argument is based largely on some observations of the Supreme Court of the United States which were made arguendo in the case of School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90. In that case, how-

ever, it was a conceded fact (the case having passed off on a demurrer to the bill, which admitted all of its allegations) that the defendant who was proceeded against was doing business and inviting patronage from those having physical ailments on the professed theory that the human mind is largely responsible for bodily ailments, and that these could be cured or ameliorated by influences brought to bear on the mind of the patient, and that persons received treatment from the defendant with full knowledge that it was administered upon that theory. In view of these facts the court said, in substance, that the theory upon which the defendant administered medical treatment might be erroneous, but no one could say with certainty that it was erroneous, inasmuch as the truth or falsity of the theory was wholly a matter of opinion; that those who received treatment with knowledge of the principle upon which it was based could not be heard to say that they were defrauded; that, in view of the admission made by the government, it was legally impossible to say that the defendant was engaged in a scheme to defraud, and that the Postmaster General had made a mistake of law, on account of which a court of equity could afford relief, in finding the existence of a scheme to defraud upon an admitted state of facts where no fraud was possible. The case which is cited and relied upon bears little analogy to the case in hand. In the case now under consideration it appears that the complainant, to induce the sale of its "Vitality Pills" for the cure of lost manhood, by its advertisements and circulars makes certain statements of matters of fact which the Postmaster General may have found, and probably did find, to be false and misleading, and to have been made with intent to deceive the public. For example, its leading advertisement contains the statement that "after years of research eminent physicians have at last discovered a remedy which is indorsed by the leading members of the medical profession as permanent in its effect"; that "the principal ingredient is an animal extract, taken from healthy young bulls"; that "it is scientifically prepared by the best chemists in the world"; and that "the reputation of the institution (that is to say, the Missouri Drug Company) is such that all physicians know, when they stand sponsor for a remedy, that remedy must be exactly as represented; and when, upon their reputation, they make the statement that Vitality Pills will cure all cases of lost manhood, spermatorrhea, * * * and weakness of any nature of the nerve or sexual organs, a cure must be positive and permanent." The advertisement further declares that "Vitality Pills will effect a cure at any age"; that "there is no case that it will not cure permanently, except where epilepsy or insanity has already set in"; and that the company "have received many letters from people all over the country telling of the most astonishing cures made by Vitality Pills." In the complainant's circulars and other literature, which is widely disseminated through the mails, are found statements to the following effect: That the complainant's medical department "is in charge of one of the most eminent physicians in this country"; that "the organs of generation can be made larger"; that it "utters this all-glorious truth professionally, having made many successful experiments"; that "the Missouri Drug Company is one of the largest chemistries in the United States"; that "in presenting the Vitality Pills for

the cure of diseases caused by an abnormal condition of the nervous system we can unhesitatingly state that it is the best, the most certain, and only permanent cure that has thus far been discovered for the diseases and symptoms which are brought about by * * * sexual excesses," etc.; that "the formula of Vitality Pills is not a spontaneous or miraculous discovery, but was formed after years of scientific research by the greatest professors of nervous diseases, and was compounded in its present form and efficaciousness at great expense to the Missouri Drug Company"; also "that these wonderful pills are to-day accepted as the only known cure for lost manhood," etc., "and are now being used by the profession for the treatment of all disorders resulting from either self-abuse or sexual excesses"; that "it is now conceded that Vitality Pills are the only specific known which will actually cure permanently lost manhood in all its forms and conditions"; that Vitality Pills are "to-day the only cure of its kind in the world free from all injurious and objectionable properties, and will always cure if the simple directions for its use are followed"; also that the complainant has in its possession "thousands of testimonials received from men in every walk of life, both old and young, who send their thanks and gratitude for being lifted from the midnight despair into the sunshine of hope and happiness by Vitality Pills." The testimony that was adduced at the trial shows that these extravagant statements, and some others of a similar nature, which the complainant confesses that it has made to create a demand for its "Vitality Pills," rest upon no substantial basis of fact or experience, and, as some of them are statements of matters of fact, rather than expressions of opinion, the court has little hesitation in holding that the case was of a kind where the Postmaster General, acting within the authority conferred upon him by the postal laws, could properly find, as he appears to have done after giving the drug company an opportunity to be heard, that it was engaged in a scheme to obtain money through the mails by means of false and fraudulent pretenses and representations, and that it was doing so at the time the fraud order was issued.

It must also be borne in mind that it is not always true that a misrepresentation, to amount to a fraud, must be a misrepresentation as respects some matter of fact, although such is the general rule. There are well-established exceptions to this rule. An opinion may sometimes be expressed under such circumstances as will render a person guilty of a fraud; as, where one who is an expert, or who possesses peculiar knowledge of the value or the quality of an article expresses to another, who lacks such special knowledge, and who relies upon the superior information of the person with whom he is dealing, an opinion as to the value or quality of the article which he does not honestly entertain, doing so for the purpose of deceiving him. Cooley on Torts (2d Ed.) p. 567, and cases there cited; Eaton on Equity, p. 291, and cases there cited. In view of this exception to the general rule, some of the statements which the complainant appears to have been in the habit of making with respect to the merits of its "Vitality Pills," treating them as expressions of opinion, might well be found to be false and fraudulent if they were not entertained by the complainant, but were

made solely with a view of inducing the unwary to purchase its "Vitality Pills."

Counsel for the complainant say that the representations which it was in the habit of making concerning its "Vitality Pills" are the ordinary puffing statements which are usually made by the manufacturers of patent medicines and other nostrums to introduce them into the market, and it is doubtless true that representations are sometimes made with little regard for the truth, to create a demand for such articles, and that the public is in that manner sometimes deceived. This argument, however, is entitled to no weight, and cannot be accepted as a sufficient excuse, much less as a justification, for the statements which the complainant appears to have made to create a demand for its "Vitality Pills." Even if it believes that these pills have some medicinal value —which they may have, as they appear to be compounded in part of some old and well-known drugs which possess some tonic properties— yet the latitude ordinarily allowed to a vendor to puff his wares would not justify such representations as the complainant's literature discloses. This court, however, is not called upon to make an independent finding upon the question whether the drug company, at and prior to the issuance of the fraud order, was or was not engaged in a scheme to obtain money through the mails by means of false and fraudulent representations or pretenses, and it would not be understood as making a definite finding on that issue. The law devolves on the Postmaster General, in the discharge of his executive functions, the duty of determining that issue, and the courts will not interfere with his action, or reverse his finding, where the complaining party has had a reasonable opportunity to be heard in its defense unless the case on which the head of the department has acted is one where, upon the state of facts laid before the officer, it is legally impossible to hold that the complaining party was engaged in obtaining money through the mails by false or fraudulent representations, so that such a finding, when made, may be characterized, not as an erroneous finding, but rather as a mistake of law. The case above cited, School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90, fell within this rule, and the judgment of the lower court was reversed because on the state of facts then involved, the existence of which were admitted, it was impossible to say that the conduct of the defendant was fraudulent. The judiciary cannot review or control the action of executive officers in the determination of questions of fact which they have been expressly empowered to determine, and in the decision of which they must of necessity exercise judgment and discretion. Enterprise Savings Ass'n v. Zumstein, 15 C. C. A. 153, 159, 67 Fed. 1000, and authorities there cited. Moreover, when an executive officer, in the performance of his duties, is called upon to determine a question of fact on which the due administration of the law depends, his finding upon such an issue, based upon conflicting evidence, if uninfluenced by fraud or mistake, is usually regarded as conclusive, and will not be disturbed by the courts. Burfenning v. Chicago, St. Paul, Minn. & Omaha Ry. Co., 163 U. S. 321, 16 Sup. Ct. 1018, 41 L. Ed. 175; Gardner v. Bonestell, 180 U. S. 362, 21 Sup. Ct. 399, 45 L. Ed. 574; United States v. Winona & St. P. R. Co., 67 Fed. 948, 15 C. C. A. 96, 107, and cases there cited.

Indeed, as this court had occasion to remark, in substance, in the case of American School of Magnetic Healing v. McAnnulty (C. C.) 102 Fed. 565, 569, if the courts could be called upon and be required to review the findings of the Postmaster General in every case of this sort the statute under consideration would not prove to be an efficient means for preventing the misuse of the mails.

In view of these considerations, the court holds that it has no right to grant the relief which the complainant seeks to .obtain. The finding of the Postmaster General that the complainant was engaged in a scheme to obtain money through the mails by means of false and fraudulent pretenses and representations is one which this court is not authorized to review or overrule, inasmuch as the finding is based on evidence which certainly tends to sustain it, and in that event the statute empowers the Postmaster General to judge of its weight and sufficiency. The bill of complaint is accordingly dismissed, at the complainant's cost.