## BRANAMAN v. HARRIS.

(Circuit Court, W. D. Missouri, W. D.   May 25, 1911.)

**1. POST OFFICE (§ 26*)—FRAUD ORDER—REVIEW BY COURTS.**

The only cases in which the courts will disturb a fraud order made by the Postmaster General are when it is tainted with fraud, absolutely without authority of law, clearly outside of the statute, or, perhaps, clearly, palpably, and obviously wrong.

[Ed. Note.—For other cases, see Post Office, Dec. Dig. § 26.*]

**2. POST OFFICE (§ 26*)—FRAUD ORDER—GROUND FOR ISSUANCE.**

What might otherwise be a legitimate business or profession may be so conducted as to render it a vehicle of fraud and deception and bring it within the purview of Rev. St. §§ 3929, 4041, as amended (U. S. Comp. St. 1901, pp. 2686, 2749), authorizing the Postmaster General to refuse the use of the mails in furtherance of schemes to defraud.

[Ed. Note.—For other cases, see Post Office, Dec. Dig. § 26.*

Nonmailable matter, see note to Timmons v. United States, 30 C. C. A. 79.]

**3. POST OFFICE (§ 26*)—FRAUD ORDER—REGULARITY OF PROCEEDING.**

A fraud order issued by the Postmaster General after an extensive hearing on two weeks' notice to the party affected is not rendered invalid because of the denial of a general request for a continuance made without any showing of facts to support it.

[Ed. Note.—For other cases, see Post Office, Dec. Dig. § 26.*]

**4. POST OFFICE (§ 26*)—FRAUD ORDER—EVIDENCE TO WARRANT ISSUANCE.**

Evidence on which a fraud order was issued by the Postmaster General against complainant, who was conducting by mail the business of treating cases of deafness as a specialist, considered, and *held* not only to warrant the making of the order, but amply to sustain it.

[Ed. Note.—For other cases, see Post Office, Dec. Dig. § 26.*]

**5. POST OFFICE (§ 26*)—FRAUD ORDER—SUIT TO ENJOIN ENFORCEMENT—PRELIMINARY INJUNCTION.**

On an application for a preliminary injunction to restrain the enforcement of a fraud order, the presumption is in favor of the legality of the action of the Postmaster General, and a strong showing is necessary to warrant the granting of the order.

[Ed. Note.—For other cases, see Post Office, Dec. Dig. § 26.*]

In Equity.   Suit by George M. Branaman against Joseph H. Harris, Postmaster.   On motion for preliminary injunction.   Motion denied.

Marley & Grover, for complainant.
Leslie J. Lyons, for defendant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

VAN VALKENBURGH, District Judge. This is a bill in equity to enjoin the defendant, postmaster at Kansas City, Mo., from executing against the complainant an order of the Postmaster General of date September 29, 1910, forbidding the said postmaster to pay any postal money orders drawn to the order of complainant or to the Dr. Branaman Remedy Company, and its officers and agents, as such, and directing the said postmaster to inform the remitter of any such postal orders that payment thereof has been forbidden, and that the amount thereof will be returned upon the presentation of the proper order, and further instructing said postmaster to return all letters, whether registered or not, and other mail matter which shall arrive at his office directed to the said concern and parties, to the postmaster at the offices at which they were originally mailed, to be delivered to the senders thereof with the words: "Fraudulent. Mailed to this address. Returned by order of Postmaster General"—plainly written or stamped upon the outside of such letters or matter; for the reason, that the said Postmaster General, upon evidence satisfactory to him, had found that the said Dr. George M. Branaman and the said Dr. Branaman Remedy Company were at the time of the issuance of such order engaged in conducting a scheme or device to obtain money through the mails by means of false and fraudulent pretenses, representations, and promises in violation of the acts of Congress in such cases made and provided.

It appears: That, upon complaint of numerous persons who had had business dealings with the complainant herein and the Remedy Company above named, the Post Office Department of the United States, through the post office inspectors of the Kansas City division, made an investigation of the business of complainant; said investigation extending over a considerable period. That on the 16th day of May, 1910, the written report of the post office inspectors was forwarded to the Postmaster General, accompanied by numerous exhibits in support thereof. That thereafter, on the 26th day of July, 1910, the Postmaster General, through the Assistant Attorney General for the post office department, forwarded to the complainant, in his own name and in the name of the Dr. Branaman Remedy Company, a notice to show cause why a fraud order should not be issued against them, in accordance with the provisions of sections 3929 and 4041 of the Revised Statutes as amended (U. S. Comp. St. 1901, pp. 2686, 2749). This notice was accompanied by a memorandum outlining the charges made and designated August 10, 1910, at 10:30 a. m., as the time when the respondents might appear and make reply to the charges set forth in the memorandum. This notice and the accompanying memorandum were duly received by the complainant, and on the date named the complainant, representing himself and the Remedy Company, appeared in person and further by Francis G. Hanchett, of Chicago, his attorney, and W. H. Ketcham, Esq., whom he had employed to make certain investigations for his defense in this proceeding. The hearing before the post office department occupied three days, and upon the conclusion thereof complainant, through his attorney, asked and received three weeks' time within which to file a brief. During this period a brief and argument of 38 printed pages was filed and considered. There-

after, on September 29, 1910, the Postmaster General issued the order above referred to denying to the complainant and the Dr. Branaman Remedy Company, its officers and agents, as such, the use of the mails in the manner specified. Thereupon complainant filed his bill in equity in this court to restrain the enforcement of this order, alleging that his business and that of the Remedy Company aforesaid is and always had been a lawful one; that the action of the Postmaster General was the result of a conspiracy involving the American Medical Association, the Jackson County Missouri Medical Association, Drs. John S. Wever, and Halsey M. Lyle of Kansas City, Mo., Drs. Porter A. Wells and Oscar Wilkinson of Washington, D. C., Paul V. Keyser, Assistant Attorney General of the United States, George A. Leonard, Post Office Inspector of the United States at Kansas City, and the Assistant Attorney General for the Post Office Department, which had been formed as alleged for the purpose of destroying the complainant's business; that the charges made against complainant were wholly false and fraudulent; that said hearing before the post office department was held without reasonable and sufficient notice; that at said hearing there was no evidence to show or tending to show that the complainant or the Remedy Company were conducting or had ever conducted a scheme or device for obtaining money or property through the mails by means of false or fraudulent pretenses, representations, or promises; that the finding of the Postmaster General was without any evidence upon which the same might legally be based; that the whole matter was without the jurisdiction of the Postmaster General; and that the Postmaster General was without authority in law for making said order.

To this bill of complaint the United States Attorney for the Western District of Missouri made answer, and the cause came on for hearing upon the question of the issuance of a temporary injunction. At said hearing there was introduced, by common consent, all the matters in evidence before and under consideration by the Postmaster General. In addition thereto, the complainant offered a large number of affidavits in support of his contention. The government offered affidavits of the United States Attorney and Post Office Inspector Leonard controverting certain statements more particularly affecting their personal connection with the controversy. The matter was exhaustively argued. Meantime, without the intervention of a restraining order, the status quo was preserved, with some modification, by agreement of parties.

[1] The law governing the authority of the Postmaster General in cases of this nature has been clarified and settled by recent exhaustive opinions both by the Supreme Court of the United States and the Court of Appeals for this circuit. It has been the settled law in this country for more than 100 years that courts will not interfere to control an executive officer in the discharge of a duty involving the exercise of judgment and discretion. Beginning with the opinion of Chief Justice Marshall in Marbury v. Madison, 1 Cranch, 166, 2 L. Ed. 60, this doctrine has been steadily maintained. In that case it was said:

"Whatever opinion may be maintained of the manner in which executive discretion may be used, still there exists, and can exist no power to control that discretion." Noble v. Union River Logging Railroad, 147 U. S. 171, 13

Sup. Ct. 271, 37 L. Ed. 123; Decatur v. Paulding, 14 Pet. 515, 599. 10 L. Ed. 559, 609; Gaines v. Thompson, 7 Wall, 347, 19 L. Ed. 62; United States ex rel. Dunlap v. Black, 128 U. S. 40, 9 Sup. Ct. 12, 32 L. Ed. 354; Burfenning v. Chicago, St. Paul, etc., Ry. Co., 163 U. S. 323, 16 Sup. Ct. 1018, 41 L. Ed. 175; Johnson v. Drew, 171 U. S. 93, 18 Sup. Ct. 800, 43 L. Ed. 88; Gardner v. Bonestell, 180 U. S. 362, 21 Sup. Ct. 399, 45 L. Ed. 574; In re Rapier, 143 U. S. 110, 12 Sup. Ct. 374, 36 L. Ed. 93; Enterprise Savings Association v. Zumstein, (C. C.) 64 Fed. 837; American School of Magnetic Healing v. Mc-Annulty, (C. C.) 102 Fed. 568; Id., 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90; United States ex rel. Riverside Oil Co. v. Hitchcock, 190 U. S. 316, 23 Sup. Ct. 698, 47 L. Ed. 1074; Bates & Guild Co. v. Payne, 194 U. S. 106, 24 Sup. Ct. 595, 48 L. Ed. 894; Public Clearing House v. Coyne, 194 U. S. 497, 24 Sup. Ct. 789, 48 L. Ed. 1092; Harris v. Rosenberger, 145 Fed. 449, 76 C. C. A. 225, 13 L. R. A. (N. S.) 762; Missouri Drug Co. v. Wyman (C. C.) 129 Fed. 623; Bank v. Gilson, 161 Fed. 286, 88 C. C. A. 332.

In the foregoing cases the supervisory control retained by the courts over the acts of executive officers is well defined. If fraud is present and the executive officer acts arbitrarily and without substantial and credible evidence to support his conclusions, or entirely beyond the limits of his powers, and without the authority of any law, the citizen is not without his remedy. But what is the extent of the court's inquiry in such cases? It will examine into the charges of fraud, if any; it will note whether the administrative officer has acted in the matter within his authority; it will ascertain what proceedings were had and what evidence was produced before him; and, if it finds that there was no fraud, that the officer has acted within the authority conferred upon him by statute, and that there was credible evidence before him tending to sustain his decision, then it will properly proceed no further with that inquiry, because it has no jurisdiction to do so. It cannot review his decision and substitute its judgment for his upon the questions of law and fact confided by law to his discretion. To hold otherwise would be to set at naught the well-considered and consistent decisions of our courts of last resort for more than a century. "The reason for this," says Mr. Justice Miller in Gaines v. Thompson, supra, "is that the law reposes this discretion in him for that occasion, and not in the courts. The doctrine, therefore, is as applicable to the writ of injunction as it is to the writ of mandamus."

In United States ex rel. Dunlap v. Black, supra, the same learned justice said:

"The court will not interfere by mandamus with the executive officers of the government in the exercise of their ordinary official duties, even where those duties require an interpretation of the law; the court having no appellate power for that purpose."

In Decatur v. Paulding, supra, Chief Justice Taney said:

"If they (the courts) supposed his decision to be wrong, they would, of course, so pronounce their judgment. But this judgment, upon the construction of the law, must be given in a case in which they have jurisdiction, and in which it is their duty to interpret the acts of Congress, in order to ascertain the rights of the parties before them."

In Re Rapier, supra, Mr. Chief Justice Fuller, asserting the power of Congress over what shall or shall not be carried in the mails through the governmental agencies which it controls, said:

"That that power may be abused furnishes no ground for a denial of its existence if government is to be maintained at all."

Similarly, in American School of Magnetic Healing v. McAnnulty (C. C.) 102 Fed. 568, Judge Thayer said:

"On this ground a strong plea was made that the courts should if possible, so construe the statute as to enable them to control the exercise of the power in question by reviewing the decision of the head of the Post Office Department, in whom the power has been lodged. In answer to this suggestion it is sufficient to say that in whosoever hands power is lodged, whether in the judicial or executive branch of the government, it is liable at times to be abused, or erroneously exercised; and the fact that a particular authority may be abused is in itself no reason why a court should assume a jurisdiction to control its exercise which does not of right belong to it. Moreover, if the action of the Postmaster General was liable to be arrested on any and every occasion where a party complaining of his action sees fit to appeal to the courts, it is probable that the statute would not afford as efficient means for preventing the misuse of the mails as Congress intended it to afford."

In the opinion of Mr. Justice Peckham in American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90, the following propositions were assumed:

"(1) That Congress has full and absolute jurisdiction over the mails, and that it may provide who may and who may not use them, and that its action is not subject to review by the courts.

"(2) The conclusive character of the determination by the Postmaster General of any material and revelant questions of fact arising in the administration of the statutes of Congress relating to this department.

"(3) That when a question of fact arises, which, if found in one way, would show a violation of the statute in question in some particular, the decision of the Postmaster General that such violation had occurred, based upon some evidence to that effect, would be conclusive and final, and not the subject of review by any court."

It was there held that the case then under review, as gathered from the statement of the bill of complaint and admitted by the demurrer, was a case without the law and not within the jurisdiction of the Postmaster General under the fraud statute. And, because of a misapprehension of some of the language in that opinion, this case has been urged as justifying a practically unlimited power in the courts to review the acts of executive officers. But in the later case of United States ex rel. Riverside Oil Company v. Hitchcock, Mr. Justice Peckham makes certain the exact extent to which his former opinion was intended to go. He says:

"Whether he decided right or wrong is not the question. Having jurisdiction to decide at all, he had necessarily jurisdiction, and it was his duty to decide as he thought the law was, and the courts have no power whatever under those circumstances to review his determination by mandamus or injunction. The court has no general supervisory power over the officers of the land department, by which to control their decisions upon questions within their jurisdiction. * * * Neither the case of Roberts v. United States. 176 U. S. 221 [20 Sup. Ct. 376, 44 L. Ed. 443], nor that of American School of Magnetic Healing v. McAnnulty, 187 U. S. 94 [23 Sup. Ct. 33, 47 L. Ed. 90], decides anything opposing these views."

189 F.—30

In Missouri Drug Co. v. Wyman, supra, Judge Thayer said:

"Congress having declared that certain kinds of printed matter shall be nonmailable, and that the mails shall not be used to accomplish fraudulent schemes, whether certain mail matter belongs to the prohibited class, or whether a person is in fact making a fraudulent use of the mails, is within the jurisdiction of the executive branch of the government, the determination of which is not reviewable by the courts if sustained by any credible evidence."

And again, in American School of Magnetic Healing v. McAnnulty, Mr. Justice Peckham said:

"In overruling the demurrer we do not mean to preclude the defendant from showing on the trial, if he can, that the business of complainants as in fact conducted amounts to a violation of the statute as herein construed."

In Public Clearing House v. Coyne, the Supreme Court, speaking through Mr. Justice Brown, said:

"If the ordinary daily transactions of the departments, which involve an interference with private rights, were required to be submitted to the courts before action was finally taken, the result would entail practically a suspension of some of the most important functions of the government. Even in the recent case of School of Magnetic Healing v. McAnnulty, 187 U. S. 94 [23 Sup. Ct. 33, 47 L. Ed. 90], the constitutionality of the law authorizing seizures of this kind by the Postmaster General was assumed, if not actually decided; the only reservation being that the person injured may apply to the courts for redress in case the Postmaster General has exceeded his authority or his action is palpably wrong. * * * We think it within the power of Congress to intrust him (the Postmaster General) with the power of seizing and detaining letters upon evidence satisfactory to himself, and that his action will not be reviewed by the courts in doubtful cases."

In Bank v. Gilson et al., supra, the Court of Appeals for this circuit, speaking through Judge Sanborn, and after an exhaustive review of the cases, held:

"In a doubtful case within his jurisdiction in the absence of fraud or a gross mistake of fact where there is some evidence which is satisfactory to the Postmaster General to sustain a fraud order issued under sections 3929 and 4041 of the Revised Statutes, as amended, his decision of a question of fact upon which the order is founded is conclusive, and it will not be reviewed by the courts."

The only logical deduction from the foregoing pronouncements, and many others which might be added, is that the only cases in which courts will disturb such a decision are when it is tainted with fraud, absolutely without authority of law, clearly outside of the statute, or perhaps clearly, palpably, and obviously wrong. In other words, where the question of wrong admits of no doubt. The decision will be upheld if sustained by some credible evidence.

Mindful, no doubt, of these unavoidable conclusions, complainant seeks to bring this case within some of the exceptions stated, by charging fraud in the form of an unconscionable conspiracy, by insisting that the fraud complained of was a matter of opinion only, not of fact, and not susceptible of judicial determination, and, in any event, that the Postmaster General had before him no evidence upon which such a finding could be predicated.

Respecting the conspiracy charge, it must be stated that its presentation at the hearing took the form of bald assertion without pretense

of plausible substantiation. Such a conspiracy, if it existed, would no doubt form a strong basis for review by the courts; but, involving, as it does, high officials of the government in a number of distinct departments, and citizens of high standing in separate walks of life, the presumption is strongly against its existence, and it could be entertained and considered only upon the clearest and most convincing proof. At the hearing before the Postmaster General, as well as' that before this court, still another conspirator was implicated, though not included in the bill of complaint. This was Mr. Leslie J. Lyons, now United States Attorney for this district. Before the Post Office Department Dr. Branaman testified as follows:

"I went to see him (Lyons) and asked him to let me go before the grand jury and tell what I know about the case. He said: 'I wouldn't think of it for a minute.' He said: 'I want to indict you, and I would not allow any information to get before the grand jury in your interests in any way. If I let you go before them, I know I could not indict you.' He said that was the instructions from the department. I said to him: 'Is it not a fact that the department is urged by the American Medical Association and that the Jackson County Medical Association is after you?' He said: 'That's it.'"

These statements are practically reiterated by one W. D. Egolf, who claims to have purchased the greater part of Dr. Branaman's business. To these statements Mr. Lyons interposes an emphatic denial. Involving, as they do, the official and personal dishonor of a public official of known high standing, as well as that of the Department of Justice, from which his instructions were supposed to have been issued, the court has no hesitation in pronouncing these charges, so far as this hearing is concerned, to be wholly without foundation.

Nor is it true that the charges preferred by the Post Office Department involved matters of opinion only, and not cases of actual fraud in fact, in regard to which opinion formed no basis. In his memorandum for the Postmaster General the Assistant Attorney General for that department says:

"The department has not undertaken to decide the scientific question of the propriety of the use of electricity for deafness. The question with the department is instead entirely different, and is whether this business is based on actual fraud in fact. Is Dr. Branaman honestly practicing his profession and curing and trying to cure patients, or is he simply using that as a guise to perpetrate a deliberate fraud upon the public and by false and fraudulent representations, pretenses, and promises get money through the mails? I find as a matter of fact that he is not honestly trying to cure those who answer his advertisements and pay him money."

[2] An inspection of the evidence before the Postmaster General clearly shows that such was the theory upon which the hearing was conducted. It can now no longer be doubted that what might otherwise be a legitimate business or profession may be so conducted as to render it a vehicle of fraud and deception and within the purview of these statutes. Missouri Drug Co. v. Wyman (C. C.) 129 Fed. 623–630; Miller et al. v. United States, 133 Fed. 337, 66 C. C. A. 399; Harris v. Rosenberger, 145 Fed. 449, 76 C. C. A. 225, 13 L. R. A. (N. S.) 762; Horn v. United States (C. C. A.) 182 Fed. 721. Nor does the fact that certain physicians on both sides gave expert opinion testimony upon some phases of the case convert it into one based upon

false opinions instead of actual fraud in fact. Such opinion testimony is commonly used in various fields of litigation, and serves properly to aid the judgment in cases where the facts which form the real foundation of the action are disputed.

[3] The undisputed testimony is that two weeks' notice was given of this hearing before the Post Office Department. It is true that the complainant asked a continuance, which was not granted. The application, however, was merely general in form and contained no statement of facts from which its necessity could be determined. No showing was made as to witnesses required, nor what they might be expected to establish. The parties appeared and introduced a large amount of testimony of the nature which they deemed essential and important. Furthermore, this investigation had been pending for some months prior to the date of this hearing; and that complainant considered the inquiry to be a serious one is evidenced by the fact that in May this same Egolf, to whom reference has heretofore been made, as alleged business manager of the George M. Branaman Company, employed W. M. Ketcham of Chicago, who is, as he says, connected with the business of a legal and investigating character, to institute an investigation of the mail-using methods of the business of the company. Ketcham conducted an extensive investigation by inquiry and correspondence and placed before the Post Office Department the results of his labor. The showing made convinces that the complainant was neither without anticipation of that hearing nor preparation for his defense. Furthermore, all the time requested for the preparation of brief and argument was granted. It cannot be said that the complainant did not have his day in court, as that term is used in connection with such investigation.

[4] It remains to consider then whether the Postmaster General had before him evidence upon which he could found the conclusion reached by him. Bearing in mind that these investigations are not in contemplation of law invested with the formalities which attend trials in the courts of competent jurisdiction, there must be evidence of a legal character to sustain the finding of the administrative officer; but necessarily it need not in some particulars be presented in the strict form demanded in court trials. It is contemplated that these hearings take place at the seat of government, that the witnesses are in many instances widely separated, and that the personal attendance of those who testify is not always practicable on the part either of government or respondent. The department makes use of the written reports and investigations of its sworn agents, and affidavits in large part take the place of personal testimony. In this manner the hearing was conducted on both sides, and without objection from any source.

The finding of the Post Office Department was that the business conducted by complainant is a scheme and device for obtaining money through the mails by means of false and fraudulent pretenses, representations, and promises, in that Dr. Branaman is not honestly practicing his profession, and trying to cure patients, but that he is simply using his profession as a guise to perpetrate a fraud upon the public; that he pays little attention to symptom blanks and solicits practically

every one who answers his advertisements to buy his head cap and medical treatment; that his promises and treatments are issued recklessly and without good faith and with the end in view of procuring a greater number of patients and getting their money without regard to the results to be attained. Is this finding sustained by some or any credible evidence upon which it may be legally founded?

It is deemed neither necessary nor advisable to attempt an exhaustive review of the voluminous evidence in this case. It will be sufficient to call attention only to such leading features thereof as may be sufficient for the determination of this crucial question. To test the sincerity of complainant's business methods and to determine his intent, Inspector Leonard, who was detailed upon this case, prepared and caused to be prepared and sent out 13 test letters with their subsequent symptom blanks, and received in return responsive diagnoses from complainant during the period between January 14 and April 5, 1910. His inquiries were made under various different names adopted for this purpose. One diagnosis was dated January 14th, another February 2d, another February 3d, another February 10th, another March 1st, two on March 3d, one on March 10th, two on March 25th, one on April 2d, and two on April 5th. The responses of the alleged patient on the symptom blanks were in most cases, with the assistance of experts, so framed as to indicate clearly either cases of deafness that were incurable, according to tests laid down in complainant's own literature, as having been caused by explosions, brain fever, including meningitis and the like; cases involving an accident such as a violent blow to the nose in which catarrh, if present at all, existed only as an incident; and cases in which neither catarrh nor any other disease was present. Some of the troubles complained of were of long standing; others covering a very short period, such as two weeks. From the symptom blanks sent the complainant must necessarily, if acting in good faith, have found either that the diseases complained of were incurable, which he expressly announced he would not accept, or were due to causes other than catarrh, or that the answers indicated no specific trouble at all, or were too meager to justify any diagnosis whatever. In his literature and advertisements complainant had invited correspondence upon the claim that he was merely seeking to benefit suffering humanity; that he wanted no money; and that he would send two months of his treatment free, provided the sufferers would make known to him their condition. In all of the 13 cases, covering this short period, the trouble was diagnosed either as catarrh, or deafness caused by catarrh as the case might be, and of such a deep seated and chronic nature that cure by drugs alone was out of the question, but that a combination treatment, including the head cap at a price of $8, was absolutely necessary, and that in case this cap should be purchased the two months' medicines would be sent free as advertised. Dr. Branaman, when brought face to face with these symptom blanks at the hearing before the Post Office Department, did not pretend to justify his diagnosis in most cases. After reflection and analysis he makes the following explanation of these cases in an affidavit presented at the hearing of this case. He says that three of them, to wit, Dunne, Barrett, and Le Barre, were

received and diagnosed by his assistant, Dr. Perkins, in his absence; that four of them, to wit, Bammer, Durrall, Murray, and R. Brown, were properly diagnosed; that five, to wit, Giesman, Leonard, G. W. Brown, Hampshire, and Thomas, were erroneously diagnosed; how, he cannot explain, unless the papers became mixed during his examination. Of the Mary Lorimer cases he says nothing. But he practically confesses that but 4 out of the 13 received a proper diagnosis, thereby, at least, largely confirming the opinions of the government's expert witnesses, to which exception is taken in the argument of counsel. In fact, an inspection of these papers discloses, even to the layman, the absurdity of the conclusions reached. Furthermore, the diagnoses of admittedly widely differing cases were practically identical and made upon printed forms. In fact, all the diagnoses sent out were upon printed forms, and this is true of a large number, in fact all, of the cases which were brought to the attention of the department. In these stock printed forms the explanation or excuse for not sending the free medicines as advertised was always incorporated. The statement respecting the deep seated and chronic nature of the disease and absolute necessity of the head cap was also thus anticipated in stereotyped phraseology. And so uniform and universal was this practice that the inference of a premeditated intent to assume this attitude towards prospective patients may legitimately, if not necessarily, be inferred.

The four cases in which complainant insists his diagnosis was correct are the only ones in which there could be any pretense apparently of a catarrhal condition at all. In the case of Richard Brown a case of cancer was framed; in that of Zenia Durrall a constitutional trouble of like seriousness; Joseph T. Murray was hit eight months before on the right side of his nose with a baseball, since which time his right nostril had been closed. In these three cases it is obvious that catarrh, if present at all, was merely an incident; more serious trouble being clearly indicated. The stock diagnosis was employed. In the case of Susan Bammer the symptom blank affirmatively stated only the following:

"That she is a little girl fourteen years old; has had something the matter with her right ear; her hearing in that ear is not good; she has been troubled that way just a short time, and doesn't know what caused it."

In that case the complainant makes the regular stock diagnosis of a general catarrhal inflammation of the membrane of the nose, throat, and the middle ear, which has become so deeply seated that the head cap is necessary. At the hearing it was urged on behalf of complainant that the court had before it only 13 cases out of all the thousands thereof during the 16 years of complainant's practice. But 13 identical experiences out of 13 tests sent within a period of less than three months give certainly a very high percentage.

Corroborative incidents might be multiplied, but this is deemed unnecessary to indicate the basis of the decision in this case. It is evident from the reading of the evidence that Dr. Branaman, finding the mail treatment of the class of patients described by him to furnish greater promise than the large, lucrative, and legitimate office business which he claims to have built up, abandoned the latter for the former. The

plan seems to have been a smaller individual margin of profit upon a larger volume of business with patients so far removed that professional responsibility is reduced to the minimum. The object is to get in touch with the sufferer. This is followed by a stock diagnosis, in every case, of catarrh, deafness, asthma, or head noises; all founded upon catarrhal trouble. Utter indifference is exhibited as to what may be indicated by the symptom blank. The object is to get the patient and as much of his money as possible. Not only was the conclusion reached by the Post Office Department sustained by the evidence before it, but it is difficult to see how it could have arrived at any other decision. It should be said here, however, that the court has not considered the evidence in this case with the view of substituting its judgment for that of the Postmaster General, but merely for the purpose of ascertaining whether that officer acted within the authority conferred upon him by statute, and whether there was credible evidence before him tending to sustain his decision.

[5] It is earnestly urged upon the court, by counsel for complainant, that this is not the final hearing of the case, and that it is sufficient to justify the granting of a temporary restraining order if the complainant shows the existence of a prima facie right with a threatened injury to that right by the defendant, and that the granting of such an order will be less injurious to the defendant than the refusal to grant it will be to the complainant. This is no doubt a correct statement of equity practice in cases to which it applies. But we start here with certain presumptions in favor of the action of an administrative officer of the government which must be overcome by a strong showing to the effect that his discretion has been improperly exercised. This showing, in the view of the case already expressed, the complainant has failed to make; nor is it probable that he can be more successful on final hearing. The additional evidence produced before this court was little more than an amplification of that produced before the Postmaster General. It added no new features and little, if any, additional weight; nor has complainant indicated that he can present his contention more effectively upon final hearing.

It is therefore not perceived that the situation is one that would justify the issuance of a temporary injunction to preserve the status quo pending final hearing, and the application of complainant will be denied.