ENTERPRISE SAV. ASS'N v. ZUMSTEIN, Postmaster.

(Circuit Court of Appeals, Sixth Circuit. May 13, 1895.)

No. 275.

1. POWERS OF CONGRESS—POSTOFFICE—LOTTERIES.
   It is within the power of congress to confer authority upon the head of the postal department to direct a postmaster to refuse the delivery of registered letters or the payment of money orders to a person or corporation which, upon evidence satisfactory to the head of the department, is found to be engaged in conducting a lottery.

2. COURTS—JURISDICTION—INJUNCTION AGAINST EXECUTIVE DEPARTMENT.
   The courts have no jurisdiction to enjoin the execution of an order of the postmaster general, made pursuant to Rev. St. §§ 3929, 4041, and Act Cong. Sept. 19, 1890, finding that a certain corporation and its officers are engaged in conducting a lottery, and forbidding postmasters to deliver registered letters or pay money orders to them, since the making of such order involves an exercise of discretion reposed in the postmaster general. Commerford v. Thompson, 1 Fed. 417, and Bank v. Merchant, 18 Fed. 841, distinguished.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

The complainant is a corporation organized under the laws of the state of West Virginia, and brings this bill against John Zumstein, as postmaster of the city of Cincinnati. The bill complains that the defendant, in his official capacity as postmaster of the city of Cincinnati, having control of the collection, distribution, receipt, and delivery of the mails of registered letters, and of the payment of postal orders, has arbitrarily, illegally, and without right, undertaken to interfere with, stop, and prevent the employment and the use of the registry department and the postal money order department of the postoffice of the city of Cincinnati in the carrying on of the complainant's business; that "the said defendant, the postmaster of the city of Cincinnati, bases his action, in such interference and denial to your complainant of the postal facilities of the postoffice of the city of Cincinnati, upon an alleged order received by him from the postmaster general of the United States, of date March 31, 1894, and which said order the postmaster makes as his excuse for so interfering with the employment by your complainant of the facilities of the postoffice at Cincinnati," and which said order so now in possession of the said defendant is as follows:

"Postoffice Department.
"Washington, D. C., March 31, 1894.
"Order No. 100.

"It having been made to appear to the satisfaction of the postmaster general that the Enterprise Savings Association (S. A. Stevens, pres.; J. C. Groene, vice pres.; W. R. Sypher, treas.; C. K. Ebann, sec'y; J. S. Munsell, gen'l manager), at 610 Neave Building, Cincinnati, O., are engaged in conducting a lottery or similar enterprise for the distribution of money or personal property by lot or chance through the mails, in violation of the provisions of section 3894, Rev. Stat. of the United States, as amended: Now, therefore, by authority vested in the postmaster general by sec. 3929 and 4041, Rev. Stat. of the United States, and by act approved Sept. 19, 1890, I do forbid the payment by the postmaster at Cincinnati, Ohio, of any postal order drawn to the order of said company and its officers aforesaid; and the said postmaster is hereby directed to inform the remitter of said postal money order that payment thereof has been forbidden, and that the sum of said money order will be returned upon presentation of a duplicate money order applied for and obtained under the regulations of the department. And upon the same evidence the postmaster at Cincinnati. O., aforesaid, is hereby instructed to return all registered letters which shall arrive at his office, directed to the said company and its officers aforesaid, to the postmasters at the offices at which they were originally mailed, with the word 'Fraudulent' plainly written or stamped upon the outside of such letters.

"[Signed]                W. S. Bissell, Postmaster General.
"To Postmaster, Cincinnati, O."

The bill then alleges that it is not conducting a lottery, or any like enterprise; and, to show the character of its business, it makes an exhibit of its charter, by-laws, and its form of application for bonds or certificates, and the terms of its certificates, together with its advertising circulars. Its method or plan is thus summarized in the bill:

"The certificates of the Enterprise Savings Association are sold only in blocks of three, whereby each purchaser is compelled to buy a multiple, there being no denomination as to the face value of such contract, in the way of a guaranty, except the amount of money deposited by the purchaser, with interest at six per cent. per annum, for the average time, and the repayment of such said sum the company guaranties to the purchaser of such certificates. In addition to the said principal sum, with interest so as aforesaid guarantied, the purchasers of said certificates are likewise entitled to, and your complainant agrees to pay, their proportionate share of the surplus earnings of the said association for the length of time their contracts have been in force, only. The certificates of the association are nonforfeitable, after they have reached the age of three years. The guarantied value of said certificates so reaching the age of three years being the amount deposited by the certificate holder, with six per cent. interest per annum for the average time as aforesaid. The paid-up value of such said certificates that have reached the age

of three years as aforesaid being dependent upon the profits of the company that shall have accrued at the time of such maturity, save that there is guarantied to such certificate holder, upon such certificate, the amount of money he has so paid into the association during that time, with interest at six per cent. for the average time as aforesaid, and his proportionate share during the life or term of his contract, of the profits of the said association during that time, which said profits consist of the sums paid by certificate holders that have, during said term of time, lapsed or become forfeited, together with fines and interest from investments. The paid-up value of the certificates so issued by the complainant must be redeemed, and the complainant agrees to redeem the same not later than one hundred and twenty (120) months from the date of the original contract certificate. By the terms of the contract certificate issued by the complainant association, all certificates so issued are paid up in full in five years and five months from the date thereof, the amount so paid at that time upon each certificate by each certificate holder, at the rate of monthly payment described in said contract certificate, being $100; and thereupon the complainant association issues to said certificate holder a paid-up certificate in lieu of his original contract or certificate, by the terms of which the holder is not required and does not make further monthly payment, or any payment in fact, but which said certificate your complainant association redeems, and agrees to redeem not later than one hundred and twenty months from the date of the original contract certificate. The purchaser of such certificates, therefore, upon the date of the month of the issuance of such certificate to him, pays to the association the sum of $5; each month thereafter he pays to the association $1.50, save upon the last or sixty-fifth month he pays the sum of fifty cents; thus making the sum of $100 required to be paid by each certificate holder, then entitling him to receive a paid-up certificate as aforesaid. In addition to the said sum that the purchaser of such certificate is entitled to receive, and which the association agrees to pay him, with interest as aforesaid, the said certificate holder is entitled to receive, and the association agrees to pay him, his proportionate share of the profits, as aforesaid, derived by the association from the sources heretofore set out and described. The amount of such profits is uncertain, dependent upon lapses, fines, and interest, as aforesaid; but this is aside and beyond and in addition to the said sum of money so in the aggregate paid in by the said certificate holder, with interest at six per cent. upon such payments for the average time. But the said contracts of the association evidenced by the said certificates mature at a definite time, are for a fixed sum, —the said sum being the total payments of the certificate holder, together with the interest as aforesaid.

"A maturity table is prepared and employed by the said complainant association, which begins (the certificates being numbered as aforesaid) with the lowest numbered certificate then in force (that is to say, which has not lapsed under the contract), beginning with the number 1, and succeeded by its multiple by 3, provided such multiple has not been forfeited as aforesaid. If, however, any such multiple should have lapsed or become forfeited, the association pays the next highest number to such forfeited or lapsed multiple in force, that is not lapsed or matured, the association then maturing certificates by following its multiple 3. That is to say, assuming that the certificate numbered 1 is in force, that is paid first, followed by 3, if said certificate has not lapsed, then 9, then 27, until a multiple has been reached larger than the number of certificates sold and numbered by the association the month previous. When such a number is reached, it is not matured, but the series of certificates are redeemed, reverting, however, to 2 and its multiple by 3, 6–18, provided such numbers have not lapsed or been redeemed, and, if lapsed, the number next highest in its numerical order to such multiple is redeemed, with its multiple, and so continuing; the certificates, however, being sold in series of five hundred each. The maturity of certificates is controlled by and entirely dependent on, the action of certificate holders, in this: that the said certificates are matured by fixed numbers, that are not, and cannot be, varied, save only by the lapsing or forfeiting of certificates. And such maturing of certificates is not, therefore, dependent upon any chance, or allotment by chance, or by the manipulations, of any kind or character, by the officers of the association, or by any other outside or extraneous element,

the fixed mathematical certainty of maturity and payment of each certificate being varied only by the failure of a certificate holder to comply with his contract, lapsing or forfeiting the same, and which said lapsing or forfeiting working a forfeiture of the sums of money theretofore paid by such certificate holder to the association, constituting one of the elements of profits of the association, to the advantage of the remaining certificate holders, and to their advantage only. The $5 paid by each certificate holder at the time of the issuance of the said certificate to him is employed by the association as a fund, under its by-laws, and by its contract with each certificate holder, in the employment of agents, the establishment of agencies, canvassing of territory, and the incidental expenses of soliciting, and extending the business of the association. The sum of $1 for each month succeeding the first is paid into and retained in what is known as the 'Maturity Fund,' out of which the certificates maturing are paid. Twenty-five cents per month is paid into and devoted to the maintenance of the general expenses of the company, the remaining twenty-five cents per month paid by the certificate holders is paid into and retained in the reserve fund, which is put at interest, which interest is one of the profits of the association distributed to the certificate holders. After the 15th of each month, the dues upon the said certificates being due and payable upon the first of each month, certificates are matured and redeemed numerically, in the method heretofore set out; each certificate holder being paid the sum of money so paid in by him, with interest, and such sum added as is his proportionate share of the profits earned by the association; the amount so paid the holders of certificates in no event exceeding the amount then in the maturity fund, with the profits of the association added."

The prayer of the bill is that the defendant be enjoined from interfering with the said facilities of the complainant in the conduct of its business, which it alleges to be lawful and legitimate; that he be enjoined from withholding from it registered letters addressed to it, and from refusing to pay postal money orders payable by the Cincinnati postmaster to it,—and for general relief. The defendant, Zumstein, demurred upon several grounds, the third of which was as follows: "That it appears by said bill that the acts complained of as having been committed, and that are about to be committed, by this defendant, and against which the relief prayed for is sought, were committed by him by virtue of, and under the authority of, the postmaster general of the United States, and that said postmaster general, in the performance of said acts, was acting within discretion, as an executive officer of the government of the United States, according to law, and that said discretion is not reviewable by this court." This ground of demurrer was sustained, and the complainant's bill dismissed. 64 Fed. 837.

Michael G. Heintz (Charles W. Baker, of counsel), for appellant.

Harlan Cleveland, U. S. Atty., and Charles T. Greve, Asst. U. S. Atty., for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

After stating the facts as above, LURTON, Circuit Judge, delivered the opinion of the court.

The question for decision is as to the conclusiveness of the order of the postmaster general directing the postmaster at Cincinnati to return all registered letters which were directed to the complainant association, and forbidding the payment of money orders drawn to the order of said association. By section 3894, Rev. St., as amended by the act of 1890, the use of the mails for carrying or distributing letters or circulars concerning any lottery or similar enterprise is prohibited, and the depositing of such prohibited matter in the mail knowingly, and with the object that it shall be carried, is made criminal and punishable. To further accomplish the inhibi-

tion of the mails to those engaged in the vicious business described by the statute, it is provided by sections 3929, 4041, Rev. St., as amended by Act Sept. 19, 1890 (1 Supp. Rev. St. [2d Ed.] p. 803), as follows:

Section 3929: "The postmaster general may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift-enterprise or scheme for the distribution of money or of any real or personal property, by lot, chance or drawing of any kind or that any person or company is conducting any other scheme or device for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations or promises instruct postmasters at any post-office at which registered letters arrive, directed to any such person or company, or to the agent or representative of any such person or company, whether such agent or representative is acting as an individual, or as a firm, bank, corporation or association of any kind, to return all such registered letters to the postmaster at the office at which they were originally mailed, with the word 'fraudulent' plainly written or stamped upon the outside thereof, and all such letters so returned to such postmasters shall be by them returned to the writers thereof, under such regulations as the postmaster general may prescribe. But nothing contained in this section shall be so construed as to authorize any postmaster or other person to open any letter not addressed to himself. * * *"

Section 4041: "The postmaster general may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift-enterprise, or scheme for the distribution of money or of any real or personal property, by lot, chance, or drawing of any kind, or that any person or company is conducting any other scheme for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations, or promises, forbid the payment by any postmaster to said person or company of any postal money orders drawn to his or its order or in his or its favor, or to the agent of any such person or company, whether such agent is acting as an individual or as a firm, bank, corporation or association of any kind, and may provide by regulation for the return to the remitters of the sums named in such money orders. But this shall not authorize any person to open any letter not addressed to himself."

The order was one which the defendant was bound to obey, unless the postmaster general exceeded his authority in making it. From the order it distinctly appears that, in the judgment of the postmaster general, the Enterprise Savings Association was conducting a lottery, or other similar business, through the mails, in violation of section 3894, Rev. St., as amended, and that this fact had "been made to appear to the satisfaction of the postmaster general." This case is therefore not within the authority of Commerford v. Thompson, 1 Fed. 417, or Bank v. Merchant, 18 Fed. 841. In the case first cited the mail withheld by direction of the postmaster general was not registered mail at all. There was therefore no authority, under the statute, to direct the retention of such ordinary mail matter. In the case of Bank v. Merchant, cited above, the order of the postmaster general which found the fact of the unlawful use of the mails had been revoked, and the subsequent orders contained in the opinion of Judge Pardee an insufficient finding of fact.

It has been argued that any discrimination by which the use of the mails is permitted to one citizen, and denied to another, is unlawful, and that the defendant cannot justify a refusal to furnish to all equal facilities by an order of the postmaster general. This is begging the question. The power of the postmaster general to inhibit the use of the mails to any citizen must rest upon the power con-

ferred by congress in that regard. The duty of a postmaster to obey the valid order of the postmaster general is enjoined in the sections of the Revised Statutes we have heretofore set out, as well as by sections 396 and 3834, Rev. St. Congress has not undertaken to discriminate between citizens as to the provisions in question, but has undertaken to discriminate between what matter shall be mailable and what unmailable. The power vested by the constitution in congress "to establish post-offices and post-roads" has been construed universally as authorizing congress to prescribe what should be mailable matter. As said by Justice Field, in speaking for the court in Ex parte Jackson, 96 U. S. 732:

"The power possessed by congress embraces the regulation of the entire postal system of the country. The right to designate what shall be carried necessarily involves the right to determine what shall be excluded."

In Re Rapier, 143 U. S. 134, 12 Sup. Ct. 374, Chief Justice Fuller said, concerning the right of congress to exclude from the mails matter deemed vicious, that:

"The argument that there is a distinction between mala prohibita and mala in se, and that congress might forbid the use of the mails in promotion of such acts as are universally regarded as mala in se, including all such crimes as murder, arson, burglary, etc., and the offense of circulating obscene books and papers, but cannot do so in respect of other matters which it might regard as criminal or immoral, but which it has no power itself to prohibit, involves a concession which is fatal to the contention of petitioners, since it would be for congress to determine what are within and what without the rule; but we think there is no room for such a distinction here, and that it must be left to congress, in the exercise of a sound discretion, to determine in what manner it will exercise the power it undoubtedly possesses. We cannot regard the right to operate a lottery as a fundamental right infringed by the legislation in question, nor are we able to see that congress can be held, in its enactment, to have abridged the freedom of the press. The circulation of newspapers is not prohibited, but the government declines itself to become an agent in the circulation of printed matter which it regards as injurious to the people. The freedom of communication is not abridged, within the intent and meaning of the constitutional provision, unless congress is absolutely destitute of any discretion as to what shall or shall not be carried in the mails, and compelled arbitrarily to assist in the dissemination of matters condemned by its judgment, through the governmental agencies which it controls. That power may be abused furnishes no ground for a denial of its existence, if government is to be maintained at all."

It must follow from the exclusive and absolute power of congress over the whole subject of what may be carried, and what may be excluded from the mails, that it was entirely within its competency to confer authority upon the head of the postal department to direct a postmaster to refuse the delivery of registered letters addressed to a person or corporation which was engaged in conducting a lottery enterprise through the use of the registered letter department, or to forbid the payment of a postal money order drawn in favor of one engaged in conducting such a business by means of the assistance of that department of the postoffice, and that he might make such order upon evidence satisfactory to him. Neither the making of such an order, nor its enforcement, required or permitted the opening of any such registered letter, and the statute expressly prohibits the opening of any letter by the postmaster, not addressed to himself. Neither of those departments of the postal service are

essential to the ordinary use of the mails, and congress has reposed in the postmaster general an unlimited discretion as to when and where he would extend the facilities afforded by those departments. Rev. St. §§ 3929, 4027. We see no reason why congress may not confer on him authority to prevent the use of those facilities by any person engaged in using them for the propagation of a business deemed by it vicious, and not entitled to such special facilities in the extension and conduct of such schemes. The authority to inhibit the use of those postal facilities had to be vested somewhere. It was a matter pertaining to executive business, and was therefore imposed upon the executive head of the postal department. In the cases of Commerford v. Thompson and Bank v. Merchant, heretofore cited, the power of congress to vest such an authority in the postmaster general was not questioned, but admitted, by both Judges Brown and Pardee. The whole question was elaborately considered in Dauphin v. Key, 4 MacArthur, 203.

Complainant does not allege that the postmaster general has used his power either maliciously or fraudulently. Its contention simply amounts to this: that he erred in judgment, and that it is without remedy, unless the courts will take jurisdiction, reconsider the facts, and enjoin the defendant from obeying the order, and require him to extend to it the free and unlimited right to use the inhibited facilities in the conduct of its business. Have the courts of the United States jurisdiction to thus control the action of the executive department of the government? The answer must depend upon the question as to whether the refusal to deliver registered mail matter and to pay postal money orders is, under the statutes organizing the postal department, a purely ministerial duty, or does the postmaster general, under the power conferred upon him by congress concerning the circumstances under which he may direct the withholding of registered mail, or forbid the payment of a postal order, exercise judgment or discretion? We shall not undertake to analyze the elaborate and alluring plan under which an uncertain per cent. of the holders of the complainant's bonds may be redeemed at an early day in the progress of the business, and realize an enormous profit, at the expense of others enticed to invest by the prospect of an early and accidental redemption, but who, in weariness, have dropped out, and forfeited their payments. The boundary between such schemes and some of the insurance and investment methods which have managed to escape legal condemnation may be very dim. Judgment as to which side of the line complainant's device belongs would much depend upon what should be taken as the standard of a clearly legitimate enterprise. The honorable postmaster general, when called upon to pass judgment upon the business of this association, may have been somewhat perplexed as to how to deal with a scheme so elaborately arranged as to present, upon one view of it, a legitimate investment business, but which, when looked upon from the other side, seemed to show many of the features characteristic of lottery or other like schemes. The settlement of the question undoubtedly involved the exercise of judgment and discretion, and this very fact operates to

take his duty out of the mere ministerial class, and therefore beyond the control or review of the judicial department of government, by means of mandamus or injunction. In Mississippi v. Johnson, 4 Wall. 475, a ministerial duty was thus defined:

"A ministerial duty, the performance of which may, in proper cases, be required of the head of a department by judicial process, is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under circumstances admitted, or proved to exist, and imposed by law."

If the postmaster general could not have been compelled by judicial proceedings to have made an order inhibiting the use of the registry or postal money department by one at the suit of another, because the duty was not purely ministerial, but involved the exercise of judgment and discretion, it must follow that the bona fide exercise of such judgment and discretion under a statute expressly reposing the power would not justify the judicial department in reversing his action by the substitution of its judgment for that of the officer to whom congress had intrusted it. Marbury v. Madison, 1 Cranch, 137; McIntire v. Wood, 7 Cranch, 504; Kendall v. U. S., 12 Pet. 527; Decatur v. Paulding, 14 Pet. 515; Commissioner of Patents v. Whiteley, 4 Wall. 534; Gaines v. Thompson, 7 Wall. 347; U. S. v. Black, 128 U. S. 40, 9 Sup. Ct. 12; U. S. v. Windom, 137 U. S. 636, 11 Sup. Ct. 197.

In Decatur v. Paulding, cited above, the relator, Mrs. Decatur, claimed a pension both under an act and a resolution of congress. The secretary of the navy was of opinion that congress did not intend that she should have a pension under the act, and another under the resolution, and required her to elect under which she would claim, as they were for different sums. This she refused to do, and applied for a writ of mandamus to compel him to pay her according to her contention. The court refused the writ, saying:

"If a suit should come before this court which involved the construction of any of these laws, the court certainly would not be bound to adopt the construction given by any head of a department; and, if they supposed his decision to be wrong, they would, of course, so pronounce their judgment. But their construction of a law must be given in a case in which they have jurisdiction, and in which it is their duty to interpret the act of congress in order to ascertain the rights of the parties in the cause before them. The court could not entertain an appeal from the decision of one of the secretaries, nor reverse his judgment, in any case where the law authorizes him to exercise discretion or judgment; nor can it, by mandamus, act directly upon the officer, and guide or control his judgment or discretion in the matters committed to his care in the ordinary discharge of his official duties. * * * The interference of courts with the performance of the ordinary duties of the executive department of the government would be productive of nothing but mischief, and we are quite satisfied that such a power was never intended to be given to them." 14 Pet. 515.

The case of Gaines v. Thompson, 7 Wall. 347, is instructive. The secretary of the interior having instructed the commissioner of the land office to cancel an entry under which Gaines and others claimed certain lands, suit was brought, praying that the secretary and commissioner be enjoined from so canceling said entry. The defense was that the matter set up in the bill was within the exclusive control of the executive department of government, and that

the courts had no jurisdiction to interfere with the exercise of this power by injunction. The validity of the entry in question depends upon the construction of certain acts of congress, upon the meaning of which there had been different opinions entertained by different secretaries. The writ was refused. After a review of the earlier cases, Mr. Justice Miller said:

"It may, however, be suggested that the relief sought in all those cases was through the writ of mandamus, and that the decisions are based upon the special principles applicable to the use of that writ. This is only true so far as these principles assert the general doctrine that an officer to whom public duties are confided by law is not subject to the control of the courts in the exercise of the judgment and discretion which the law reposes in him as a part of his official functions. Certain powers and duties are confided to those officers, and to them alone; and however the courts may, in ascertaining the rights of parties in suits properly before them, pass upon the legality of their acts, after the matter has once passed beyond their control, there exists no power in the courts, by any of its processes, to act upon the officer so as to interfere with the exercise of that judgment while the matter is properly before him for action. The doctrine, therefore, is as applicable to the writ of injunction as it is to the writ of mandamus. In the one case the officer is required to abandon his right to exercise his personal judgment, and to substitute that of the court, by performing the act as it commands. In the other he is forbidden to do the act which his judgment and discretion tell him should be done. There can be no difference in the principle which forbids interference with the duties of these officers, whether it be by writ of mandamus or injunction."

Concerning the merits of the case, he said:

"The action of the officers of the land department, with which we are asked to interfere in this case, is clearly not of this character. The validity of plaintiff's entry, which is involved in their decision, is a question which requires the careful consideration and construction of more than one act of congress. It has been for a long time before the department, and has received the attention of successive secretaries of the interior, and has been found so difficult as to justify those officers in requiring the opinion of the attorney general. It is far from being a ministerial act, under any definition given by this court."

The act done, of which complainant complains, was done in the exercise of a discretion reposed in the postmaster general by express direction of congress, and it cannot be supervised or controlled by the courts. The decree dismissing the bill is therefore affirmed.