## ROSENBERGER v. HARRIS.

(Circuit Court, W. D. Missouri, W. D. April 24, 1905.)

1. POSTAL SERVICE—FRAUD ORDERS—POSTMASTER GENERAL—JURISDICTION.

Under Rev. St. U. S. § 3929, as amended by Act Cong. Sept. 19, 1890, c. 908, 26 Stat. 466 [U. S. Comp. St. 1901, p. 2686], authorizing the Postmaster General to issue fraud orders against any person conducting a scheme to defraud through the post-office establishment, the Postmaster General, though entitled to pass finally on questions of fact raised in such proceedings, has not exclusive jurisdiction to pass on questions of law.

[Ed. Note.—For cases in point, see vol. 40, Cent. Dig. Post Office, § 21.]

2. SAME—STATUTES—INSTRUCTION.

Rev. St. § 3929, as amended by Act Cong. Sept. 19, 1890, c. 908, 26 Stat. 466 [U. S. Comp. St. 1901, p. 2686], authorizes the Postmaster General, on evidence satisfactory to him that any person is engaged in conducting a lottery, gift enterprise, or scheme for distribution of money or any real or personal property by lot, chance, or drawing of any kind, or that any person or company is conducting any other scheme or device for obtaining money or property through the mails by means of false or fraudulent pretenses, etc., to issue a fraud order against him. *Held*, that such section contemplates three classes of transactions, namely, lotteries and other like games of chance, "confidence games," and schemes which from their very nature, in the light of business experience, are sure to end in financial disaster to their contributors; and does not include an ordinary mail-order liquor business, in which the customers are given a fair commercial equivalent for the price paid, though the seller is guilty of trade puffing and of a false statement in his advertising as to the age of his liquors.

[Ed. Note.—For cases in point, see vol. 40, Cent. Dig. Post Office, § 55.]

On Motion for Preliminary Injunction.

Harkless, Crysler & Histed and J. C. Rosenberger, for complainant.

A. S. Van Valkenberg, U. S. Atty., for defendant.

AMIDON, District Judge (orally). The complainant is now, and has been for about seven years, engaged in the wholesale liquor business at Kansas City, Mo. In the course of that business he has secured a clientage of about 5,000 customers, and his annual sales amount to about $150,000. The greater part of his trade is what is commonly known as mail-order business. Early in the present year inspectors from the Post-Office Department called upon the complainant for a disclosure as to the methods in which he was dealing with the public. He gave them a state-

ment and furnished them with his trade circulars and literature. Thereafter he was cited by the Postmaster General to show cause in Washington why what is commonly known as a "fraud order" should not be issued against him under the provisions of section 3929, Rev. St., as amended by Act Sept. 19, 1890, c. 908, 26 Stat. 466 [U. S. Comp. St. 1901, p. 2686]. He appeared before an assistant attorney for that department, and made his showing. In this showing he admitted that the circulars which he had sent out to the business community contained certain false statements. None of them are material, however, except those in which he stated that the whiskies which he offered for sale were, in one branch of his business, 14 years old and in the other 9 years old. The other false statements contained in the circulars fall under what may be properly called "trade puffing," and are not such as would have entitled a purchaser of the liquors to rescission in a court of equity. The complainant frankly admitted in his written statement made to the assistant attorney for the Post-Office Department that certain statements contained in his circulars were untrue. He offered to revise his trade literature, and remove from the same all matters which were complained of by the Post-Office Department. The next step in the procedure was the issuance of what is known as a "fraud order" to the postmaster at Kansas City, Mo., which, in effect, forbade that postmaster to deliver to complainant any mail received at the office addressed to him, but directed the postmaster to stamp all such mail as "Fraudulent" on the outside, and, in case the address of the sender appeared upon the envelope, to return the same to the sender, and, in case the address did not so appear, the mail was to be forwarded to the dead letter office at Washington.

From the showing that was made in the Postmaster General's office, and from the showing that has been made to this court, it is established beyond controversy that the liquor which the complainant furnished to his trade was of the fair commercial value in the markets of the country which he charged therefor; in other words, it appears that he gave to his customers in every case a fair commercial equivalent for that which he received from them. In fact, he carried this feature of his business to such an extent that he gave to purchasers with every sale a written guaranty that, if the article furnished was not satisfactory to the customer, it should be returned at the complainant's expense for shipment both ways, and the complainant undertook and agreed to repay to the customer the purchase price which he had received. It is stated in the bill and the affidavits supporting the same that throughout the complainant's course of business only a few transactions—six or seven, I believe—proved unsatisfactory to his customers, and that in each of those he accepted a return of the goods at his own expense, and repaid to the customer the purchase price.

Under this statute the Postmaster General is vested with quasi judicial power to pass upon all questions of fact, and his determination of such questions will be accepted as final by the courts. He cannot, however, be made the final interpreter of the law. In

this government the duty of interpreting the law is devolved upon the courts, and every person whose rights are invaded by an administrative or executive officer has a right to challenge the acts of such an officer upon the ground that they are not authorized by the statute under which the officer purports to act. It is the distinctive feature of English and American constitutional law that every executive officer, when he invades the liberty or property of the citizen, must vouch for his act a valid law. In determining whether his act is thus justified, the executive officer stands in the ordinary courts of justice on an equality with the private citizen. This is the feature of our constitutional law which distinguishes it from the administrative systems which obtain upon the continent of Europe. There an executive officer is himself the interpreter of the law, and, if his act is called in question, the party injured cannot have the question determined in the ordinary courts of justice, but he is brought before an administrative tribunal, whose members are taken from the official class whose acts are challenged, and the whole proceeding is according to administrative methods. It is not so under our system of government. It cannot be so long as our government is a government of laws, and not of men. If an executive officer may himself be both the executor and the final interpreter of the law, then the law becomes what such executive officer declares it to be. Dicey, Law of the Constitution, 176, 185; Poindexter v. Greenhow, 114 U. S. 270, 288, 5 Sup. Ct. 903, 29 L. Ed. 185; U. S. v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171; Boyd v. U. S., 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746; Hare, American Con. Law, 135, 138.

The decisions of the Supreme Court in construing this statute have clearly recognized this distinction. In a case which arose in this circuit—American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90—the Supreme Court has fully sustained the views which I have expressed. In that case it was held that a representation as to a matter of opinion could not be a fraudulent representation under this statute, however enticing and seductive it might be. The terms "false and fraudulent representations" there employed, as construed by the Supreme Court in that case, are confined to the meaning which they have received in the courts of law and equity.

There has been no decision of the Supreme Court dealing with the other feature of this statute, namely, what constitutes, within the meaning of the statute, a "scheme" or "artifice" to defraud. The duty devolves upon this court in the present case to interpret those terms.

The first part of the statute deals with "any person or company engaged in conducting any lottery, gift enterprise or scheme for the distribution of money or of any real or personal property by lot, chance or drawing of any kind." The statute then concludes with the general clause under which the present order was issued, namely, "any person or company conducting any other scheme or artifice for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, repre-

sentations or promises," etc.   This statute stands in pari materia
with section 5480 of the Revised Statutes [U. S. Comp. St. 1901, p.
3696], which makes it a criminal offense for any person to use the
mails of the United States in the execution of a scheme or artifice
to defraud.   And in that section, under the specifications as to
what constitutes "schemes" and "artifices" to defraud, are found,
first, dealings in counterfeit money, and, second, any scheme or
artifice to obtain money by or through correspondence by what is
commonly called the "sawdust swindle" or "counterfeit money
fraud," or by dealing or pretending to deal in what is commonly
called "green articles," "green coin," "bills," "paper goods," "spuri-
ous treasury notes," "United States goods," "green cigars," or any
other names or terms intended to be understood as relating to
such counterfeit or spurious articles.   I think the statute which
we are now considering is one to which the maxim noscitur a sociis
is to be applied, and that the terms "scheme" or "artifice," as used
in this statute, are to be interpreted according to the company in
which they stand.   The classes of transactions that have heretofore
fallen under the condemnation of the courts and the Postmaster
General in the enforcement of these statutes are as follows:

(1)  Lotteries and other like games of chance.

(2)  What I will designate, for the want of a better term, as "con-
fidence games."   The distinctive feature of these schemes is that
their authors obtain from their victims money or property without
any intention of ever· returning to them anything whatever, or
anything at all equivalent in commercial value to that which the
authors of the scheme receive.

(3)  Schemes that from their very nature, and in the light of
business experience, are sure to end in financial disaster, in which
their contributors will receive nothing, or substantially nothing,
in return for their contributions.   To this class belong such cases
as Public Clearing House v. Coyne, 194 U. S. 497, 24 Sup. Ct. 789,
44 L. Ed. 1092, and Durland v. United States, 161 U. S. 306, 16 Sup.
Ct. 508, 40 L. Ed. 709.   Under all these schemes the controlling
and distinctive feature is that it is the purpose of their authors to
obtain from the public money or property with the intention not to
return to the public anything whatsoever, or anything at all equiva-
lent in value to that which is received.

The complainant's business and his wrongful conduct are widely
separated from all these classes.   It comes most nearly to class
No. 2.   It belongs in that class in one feature, namely, that the
complainant in conducting his business has been guilty of false
statements—such false statements as would entitle his customers
to a rescission in a court of equity.   But his business is distin-
guished from all these classes by the facts (1) that he is dealing in
a staple article of commerce, and not in a nostrum, as was the
case of Missouri Drug Co. v. Wyman (C. C.) 129 Fed. 623; and (2)
that he has furnished to his customers in every case a commercial
equivalent for the price which he has received.

The order which the Postmaster General has issued in this case,
if it is sustained, marks a very great enlargement of his power under

this statute. In my judgment, it was not the intention of Congress by this law to place the integrity of all our business affairs under the guardianship of the Postmaster General. The doctrine of caveat emptor is still in force, and will, in the main, prove an adequate protection to the public against being seduced into purchasing against their will articles that are of the fair commercial value of the price exacted. If the doctrine of caveat emptor proves inadequate, then the courts of justice are open to parties for the redress of their wrongs.

We have lately been informed by the chief government chemist at Washington that 75 per cent. of all articles of food are adulterated; that is, that they do not contain, in fact, what they are represented to contain by those engaged in selling them. Take, for example, canned goods and preserves. This government chemist, and the heads of the food departments of the different states, unite in telling us that these articles, as a rule, are adulterated. They are sold in enormous quantities by our grocers and by those large concerns which carry on what is known as a mail-order business. Does it lie within the scope of the Postmaster General's power to institute an investigation, and, if he finds that a grocer or mail-order dealer is selling canned goods or preserves which have been adulterated, and which in his trade literature he represents to be pure, to issue a fraud order against such grocer or mail-order dealer? I think not. The same may be said in regard to dealers in spices, teas, and coffees. The same would be true as to dealers in prepared paints, which I am informed by a recent trial is a capital source of adulteration. I apprehend that the same doctrine would lie to those mail-order merchants in large cities who send out their circulars representing their cloths to be all wool and a yard wide. If the Postmaster General could institute an investigation, and find that these cloths were not all that they were represented to be, I do not believe it would lie in his power to issue a fraud order against such dealers. The statute, in my judgment, was intended to cover schemes lying outside of ordinary business channels. Such schemes may be properly stricken down in their entirety. They are proper objects for the sweeping condemnation of an executive order. It is "schemes," not ordinary business enterprises, that fall under the ban of this law. Frauds perpetrated in usual trade channels are still to be redressed in the courts, which deal with specific transactions, and inquire as to whether the complainant has been in fact deceived by the misrepresentation, and also damaged thereby; and not by executive orders, which take no account of specific acts, but strike down the entire business enterprise.

If I am mistaken in my interpretation of this statute, it is better that I should give the complainant the advantage of the doubt, for this reason: If the court should, for a brief time, suspend the execution of this fraud order, no great hardship will be entailed upon the government of the United States or upon the public. On the other hand, if my interpretation of the statute is correct, and I still refuse to grant the complainant any relief, his business is

ruined, and the injury which will befall him will be irremediable. I think it is a clear case for the proper intervention of a court of equity; and an injunction pendente lite will be allowed.