# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### PEOPLE'S UNITED STATES BANK v. GILSON et al.

#### (Circuit Court, E. D. Missouri. July 19, 1905.)

#### No. 5,192.

1. POST OFFICE—FRAUD ORDER—POWERS OF DEPARTMENT.

   The use of the postal service of the United States is not a matter of right, but of privilege, limited by the statutes declaring certain classes of matter to be nonmailable, and it is competent for the Post-Office Department to determine ex parte that a concern is using the mails in conducting a scheme to defraud, in violation of the statute, and to base an order excluding it from such use on such finding. If a hearing is granted before the issuance of such an order, the concern affected may properly be required to assume the burden of proof, and to show affirmatively that its business is legitimate and honest.

   [Ed. Note.—Use of mails to defraud, see note to Timmons v. United States, 30 C. C. A. 86.]

2. SAME—CONCLUSIVENESS OF FINDING.

   Under Rev. St. §§ 3929, 4041, as amended by Act Sept. 19, 1890, c. 908, § 2, 26 Stat. 466, and Act March 2, 1895, c. 191, § 4, 28 Stat. 964 [U. S. Comp. St. 1901, pp. 2686, 2749], which confer upon the Postmaster General power, "upon evidence satisfactory to him" that any person or company is engaged in conducting any scheme to defraud through the mails, to direct the postmaster not to deliver registered letters nor pay money orders to such person or company, the Postmaster General may find that a concern is using the mails in conducting a scheme to defraud which warrants the issuance of such an order on the evidence of the agents and inspectors of the department, and such a finding cannot be reviewed by the courts in so far as it involves questions of fact, nor unless a plain error of law is shown.

In Equity. Suit for injunction.

George H. Shields, Shepard Barclay, and Thomas T. Fauntelroy, for complainant.

D. P. Dyer, U. S. Atty., for defendants.

McPHERSON, District Judge. This is a bill in equity, filed by the People's United States Bank, a corporation existing under the

140 F.—1

laws of Missouri, in substance alleging the following facts: The defendant Frank Wyman is postmaster at St. Louis, and Henry P. Wyman is his assistant. Henry J. Gilson is in charge, under Frank Wyman, of the substation at Winner, outside of the city, but within the county of St. Louis. This substation is connected with and part of the city post office. The bank was incorporated in November, 1904, by 18 persons, most of whom reside at St. Louis, but some of them reside in other states. The capital stock, when incorporated, was $1,000,000, one-half of which was paid up. In March, 1905, the capital was increased to $2,500,000, and the amount paid in is $2,435,000. The place of business of the bank is on the fifth floor of the Woman's Magazine Building, University Heights (outside the city, near Winner substation of the post office). The stockholders now exceed 50,000 in number, scattered all through the United States. The depositors reside in all parts of the United States, and many are in foreign countries. The amount of deposits are $220,000, or thereabouts. The practical operations of the bank are in charge of a cashier under bond for the faithful performance of duty, aided by two assistants and about forty employés. The bank has been widely advertised. Considerable of the moneys arising from the sale of stock has been invested in interest-bearing securities, bonds, etc., while some has been invested in government bonds, and $75,000 in municipal bonds; and other moneys are deposited in other banks, calling for interest thereon. When the bank was organized in November of last year, the Secretary of State of Missouri, who has supervision of state corporations, including state banks, issued a certificate to the effect that it had complied with the laws governing such corporations. Since then the Missouri Secretary of State, both personally and by examiners, has repeatedly examined the affairs of the bank, and its affairs are conducted under the official scrutiny and subject to the most rigid examination of the said secretary. The depositors are to receive interest at such rates as may be agreed upon. The cashier, officers, and employés of the bank conduct the business so as to conform to the directions of the board of directors, the governing body. There are also by-laws which are to control the affairs. The business is almost exclusively done by United States mail, and is very large, and is profitable, and rapidly growing, and is conducted according to legal and honorable methods, and in no sense is it a scheme or artifice to defraud, and is not a lottery, gift enterprise, or scheme for the distribution of moneys; and false or fraudulent promises, representations, or pretenses are not made, and have not been made, in, about, or concerning its business. June 1, 1905, R. P. Goodwin, assistant attorney general for the Post-Office Department, sent to the bank, through the mail, a communication, containing a memoranda or an outline of parts of reports of post-office inspectors concerning the bank, and required the bank to answer to a charge of conducting a scheme or device for obtaining through the mails money by means of false and fraudulent pretenses, representations, and promises, and with violating such parts

of the postal laws as are contained in sections 3929 and 4041 of the Revised Statutes of the United States [pages 2686, 2749, U. S. Comp. St. 1901]. Said communication and memoranda did not disclose the names of the persons making the accusations. They were not under oath. The bank, by its officers, appeared June 16, 1905, at the Post-Office Department at Washington, and were directed to appear before Mr. Goodwin, the assistant attorney general for that department. The bank challenged the jurisdiction of that officer to hear the matter, which challenge was overruled by him. That officer demanded a showing against the charges, stating that, unless a showing was made, the charges would be taken as true, as he had already seen the reports of the post-office inspectors. The bank was denied the privilige of seeing said reports, no witness was sworn, and the bank was not confronted by any witness. The bank made a written return supported by the affidavits denying said charges, and showing that the business was conducted in a legitimate and honorable way, satisfactory to the authorities of Missouri, and setting forth the true state of affairs. It is also alleged that Mr. Goodwin is not an official of the Post-Office Department. Later on, early in this month, the Postmaster General issued what is called a "fraud order," commanding the postmaster at the office of St. Louis, which includes Winner substation, to stamp as fraudulent all mail received at said offices addressed to said bank or its officers, and return the same to the senders, when known from the envelopes, and all others to be sent to the dead-letter office. The bill concludes with a prayer for subpœnas in chancery directed to the defendants, and for an order enjoining them from carrying out the "fraud order" of the Postmaster General, to the end that all mail addressed to the bank or its officers may be delivered. Such, in substance, is the bill on which the court is to grant or deny the writ of injunction.

On July 12th instant a restraining order was issued, directing the postmaster to retain the mail in his office until the motion for injunction could be heard. The defendants have made a return to the order to show cause why the injunction should not issue. This return presents many questions of fact calling for evidence, requiring the appointment of a master. But the court, believing the case was urgent, requested counsel to present the case as though pending on the verified bill in equity only. The case has been argued with ability and eloquence very gratifying to the court. It has been seen what the bill charges. As affirmative relief is asked, it is pertinent to consider what the bill does not recite. The bill gives but partial information as to who of the many officers are on salary, and the amounts of salaries do not appear. Who of the stockholders have a voice in the management? Do the original incorporators control the election of directors and officers? If all the stockholders vote, is it by proxy, and are the proxies voluntary, or are they controlled by agreements so common of late? What dividends are promised to stockholders? Have the various stockholders equal rights as to voting or as to profits? It is said that some of the moneys are in-

vested in government bonds, other moneys in municipal bonds, and others in interest-bearing securities. Do the amounts of interest received, after paying expenses, equal the interest and dividends paid out? To whom is the money loaned? Are the officers borrowing? If they are borrowers either in person or through concerns in which they are interested, then in what amounts? How are such sums secured? If by personal surety, are the indorsers good? If by real estate security, then is the security ample for the debts? If ample, can it readily be converted into money? What relation, if any, does the bank sustain to the concern publishing the Woman's Magazine? Why are the by-laws not exhibited, and the articles of incorporation pleaded, and the general scheme not disclosed? The bill recites that in the past the bank was conducted under the supervision of, and with the approval of, the Secretary of State of Missouri. Why does not the bill charge that now the bank is conducted to the satisfaction of the officer of Missouri responsible to the people for its proper management? Why does the bill not charge that the stockholders who own the bank know the situation, and are satisfied with it? How much money, if any, was paid in by the incorporators? If paid in, was it paid from their own moneys, or did they subscribe, and then borrow from the bank, and then pay? Are the incorporators financially responsible? Why is this called a United States bank, when it is a state bank? At least some of these inquiries are pertinent. Probably other legitimate inquiries could be made. At all events, on the allegations of the bill, knowing only the information thus imparted, it is strange that any intelligent person could be found who would invest a dollar in the bank. And a prudent and honest bank examiner would never, on the information conveyed by the bill, make a report indorsing such a bank. Before doing so he would want much additional information along the lines suggested in the inquiries above suggested. I do not know what the facts are, and from what is before the court all the facts cannot be stated. If the true situation is that of an honest, well-managed, and profitable bank, as is claimed, the facts can easily be disclosed. If, on the other hand, the bank was organized by insolvents, or if it is controlled by men who are not financially responsible, or if the bank has its being to furnish large salaries, or to advance money under the guise of loans to favorites who could not otherwise nor elsewhere borrow, and sometimes on doubtful security, then all fair-minded men will approve of the action of the assistant attorney general and the postmaster general in denying the use of the mails to the concern. And it is no wonder that those officers held the showing insufficient, if the showing was as meager as is now and here made by the bill. The showing here is one of liabilities of more than two and one-half millions of dollars. The assets are stated in part only, as to what they are, and when they can be realized on. Many of the allegations of the bill are based upon the fact that the department refused to disclose the name of those complaining of the bank, and refused to disclose the evidence relied on. The bank was given a memoranda showing the nature of the charge, which the bank was

advised would constitute prima facie evidence of the warrant for a "fraud order." All of which means that the bank was called on, for the privilege of using the mails, to furnish evidence that it ought to be allowed to use the mails. Or, to state it in another way, the burden of proof was shifted to the bank. There is nothing new nor wrong in this. The recitals in a certificate of sale are prima facie proof of the truth of the recitals. The same is true when commissioners' accounts are audited. The auditing of accounts of clerks, marshals, army and navy officers, and many others, is prima facie proof of the correctness of such statements of accounts, and the balances shown to be due by such audits can be recovered without other proof, unless the officer and his sureties overcome the same by evidence negativing such certificate. The post-office inspectors are public officers. Their findings carry a presumption. And it is a settled doctrine that when an officer is acting within his duties, that his acts are prima facie within his authority, and that his findings are correct. This rule is even extended to criminal cases. In prosecutions for selling liquor in many states possession of liquor is prima facie evidence of a guilty intent to sell. It is the same as to cigarettes. There are many statutes, both federal and state, which make the doing of a thing or possession of a thing usually of itself lawful call for proof of an innocent purpose. I do not recall that any of such statutes have been held invalid, while I do know that it is of almost daily occurrence for the courts to enforce them. Complainant's contention on this point is in no way persuasive.

One of the executive departments of this government is known as the Post-Office Department, and the head thereof is the Postmaster General. He has four assistants and a very large number of aides. Section 390 of the Revised Statutes [page 220, U. S. Comp. St. 1901] provides that "there shall be employed in the Post-Office Department one assistant attorney general, who shall be appointed by the Postmaster General." One of the duties of the Postmaster General is "to superintend generally the business of the department, and execute all laws relative to the postal service." So that the allegations that Mr. Goodwin, the assistant attorney general, was not connected with the Post-Office Department, and the complaint that he acted in the matter of hearing evidence and in recommending the "fraud order," merit no attention. Every one knows that the Postmaster General in person cannot attend to the innumerable duties of the department. It is enough to know that he acted, provided the acts are legal, and the legality in no manner depends upon the fact that he was assisted by others in the department.

It appears from the bill that the bank was given a hearing before the Postmaster General, acting by the assistant attorney general. The bank had a prima facie case to overcome. It offered evidence. There was a controverted question of fact. On that question the constituted authority found adversely to the bank. No man has the right to have his mail delivered to him at his door free of charge. It is a privilege only. And the fact that it is a privilege so general as to be quite near universal does not make it less

a privilege. Obscene letters and literature have no right to the mails, because it is the policy of the government not to become a distributive agency for such filth. And the same is true, and for the same reasons, as to literature and mails building up or connected with a fraudulent scheme. Calling the concern a bank does not make it a bank. The fact that parts of its business are legitimate gives it no right to do an illegitimate business, and the government is not called on to separate the illegitimate from the legitimate business, but will suppress the whole from the mails. Such business cannot be separated. If it is an illegitimate business, the fact that men of good repute and of high standing are connected with it does not lessen the evil, but greatly aggravates it, because of the influence.

I have not had time to write an elaborate review of the many cases. The one case that is pressed upon my attention is that of Rosenberger v. Harris (C. C.) 136 Fed. 1001, decided by Judge Amidon. It appears from the opinion that the court was advised of all the evidence that was before the Postmaster General, which makes the case quite different from the one at bar. Aside from this, it must be conceded that the decision is quite a wide departure from the decisions heretofore made. But the fact is that the case was decided on the circuit, and the order granting the injunction has been appealed from, and the case is now under advisement by the Circuit Court of Appeals for this circuit. Therefore, however strong the reasoning of the opinion may be, it cannot be urged as an authority. And, while the opinion is well worth consideration, it must be read in the light of decisions, some of which are authoritative and others not of authority, but, in my judgment, equally persuasive. The cases decided by the Supreme Court of the United States are numerous, particularly in land cases, where the holdings have uniformly been that, when an officer or department is empowered by Congress to determine a question of fact, the finding of fact made is conclusive, and binding upon the courts. These cases are familiar to all the counsel in this case, as well as the bar generally. Not only has the Supreme Court many times so held, but the Circuit Court of Appeals has at a recent date reaffirmed the proposition. All of which is conceded by counsel for complainant in the case at bar. But another rule is invoked, equally well settled by the Supreme Court, and that is that errors of law by the officer or department can be and will be reviewed by the courts. Rev. St. §§ 3929 and 4041, as amended by Congress September 19, 1890 (Act Sept. 19, 1890, c. 908, § 2, 26 Stat. 466), and March 2, 1895 (Act March 2, 1895, c. 191, § 4, 28 Stat. 964 [U. S. Comp. St. 1901, pp. 2686, 2749]), provide, in substance, that the Postmaster General may, upon evidence satisfactory to him that any person or corporation is conducting any lottery, gift enterprise, or scheme or device for obtaining money through the mails by means of fraudulent pretenses or representations or promises, instruct the postmaster at the home office of such concern to stamp such mail as fraudulent, and return the same to the sender, when known from the envelopes, and all other mail shall be sent to the

dead-letter office, to be by that office opened, and then returned to the sender. The wisdom and legality and high purpose of those statutes are doubted by no one. But for those and other statutes our magnificent postal system could be, and, as experience shows, would be, used as an effective agency, at nominal cost, to aid in carrying on all kinds of schemes of debaucheries and rascalities.

It is well to consider what our postal system is. Under our Constitution it is created and kept going by Congress. It is a governmental monopoly, which all the people indorse. There is no more brilliant phase of American history than that of our postal system. It has grown from the 25-cent letter to that of 2 cents, and from carrying the mail on horseback 40 miles per day, and once per week, to a daily mail to all, and in the cities many times every day, and the mail delivered at nearly every person's door. It is apparent that with such a system there must be some one in control, and that one is the Postmaster General. Whoever posts an obscene and lascivious letter earns a place in prison. The same is true of one who posts a letter in furtherance of a scheme to defraud. But it is a crime only to post such a letter. Therefore Congress was confronted with what should be done with letters posted by innocent people, addressed to fraudulent concerns, and it was determined by statute that the Postmaster General should arrest and turn back all such mail. And as it was evident that disputes would arise, the power to pass upon the question was lodged with that officer. Applying those laws and the reasons therefor to the case at bar, what do we have? Some one, not disclosed, made complaint of the bank in question. Post-office inspectors were assigned to investigate it. They are government officers, acting under oath. The responsibilities of their office are great, and but seldom is one found who is derelict. But for them this great postal system, that works with the regularity of a clock, would be clogged, and would be honeycombed with all kinds of abuses. Their acts are of great importance, and their reports carry great weight. And it is unreasonable to ask that the Postmaster General shall resort to the methods of taking evidence according to the rules prevailing in the courts. The reports are, of necessity, evidence on which he will act. They make their reports, and their reports, in the language of the statutes, was evidence satisfactory to him, the Postmaster General, that the bank was engaged in a scheme to defraud. Then and thereupon the Postmaster General could have issued the "fraud order." But with a spirit of fairness he notified the bank to rebut that evidence. The bank had no right to make that showing. It was not obligatory upon the part of the government. It was a privilege accorded; and, in the judgment of that officer, no sufficient showing was made. Therefore we have a case in which the Postmaster General was required to act. The subject of the inquiry was whether the bank was practicing a fraud upon the people—upon the unwary. That officer had jurisdiction of the subject-matter. He acquired jurisdiction over the bank both by notice and by appearance. He received evidence satisfactory to him. This evidence, in his judgment, was not rebutted. He made

findings, and those findings cannot be reviewed by this court. And such is the holdings of the courts, as will be seen by a brief review of some of the cases. Enterprise Savings Association v. Zumstein, 67 Fed. 1000, 15 C. C. A. 153, was decided by the Circuit Court of Appeals of the Sixth Circuit, Judge Lurton writing the opinion, concurred in by Circuit Judge Taft, and Severens, District Judge. That court ruled as follows: Congress has the authority to empower the Postmaster General to refuse the delivery of letters to a corporation upon evidence satisfactory to the head of the department, which is found to be engaged in a lottery scheme. In the case of Missouri Drug Company v. Wyman (C. C.) 129 Fed. 623, decided by Judge Thayer, the following conclusions were adopted: (1) The right to use the mails is a statutory privilege, and, being a privilege conferred by statute, it can be taken from him. (2) The Constitution conferred upon Congress the power to establish and maintain a postal system. This being so, Congress has the power, which it has exercised, to confer upon the Postmaster General the authority to prevent the mails being used to disseminate communications relative to schemes to defraud. (3) The question as to whether the use of the mails is in violation of law is a matter for the Postmaster General to determine. Public Clearance House v. Coyne, 194 U. S. 497, 24 Sup. Ct. 855, 48 L. Ed. 1092, held that Congress can and does control our entire postal system, and may designate what may be carried, and what shall not be carried as mail. It was further ruled by the Supreme Court of the United States in that case that due process of law does not require the interference of the courts, and that the executive power of the government has functions to perform, and, although it at times and temporarily may operate with harshness upon individuals, the rights of the public must overrule the rights of individuals. It was held in that case that the Postmaster General did not exceed his authority in issuing the fraud order. In the same report (194 U. S., at page 106, 24 Sup. Ct. 595, 48 L. Ed. 894) the Supreme Court held in the case of Bates v. Payne, Postmaster General, that, when the decisions of questions of fact are committed by Congress to the judgment and discretion of the head of a department, his decision thereon is conclusive. The court further held that, even upon mixed questions of fact and law, his decision will carry a strong presumption of its correctness, and the courts ordinarily will not review it, although the courts in such cases have the power. The case of American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90, is relied on by the complainant's counsel, and is urged with earnestness. The concern charged with fraud in that case represented that the mind of man is almost solely responsible for the ills, pains, and diseases of the body, and is a factor in healing and curing such ailments and diseases. The bill further charged that the fraud order which had been issued, if not set aside by the court, would destroy a legitimate business. The case before the court below was not as to whether an injunction should issue, but was upon demurrer, which, of course, admitted all allegations of the bill to be true. And all that the Supreme Court held was that complainant

was entitled to a hearing—a proposition not at all like the claim for an injunction before final hearing. That case, in my judgment, is in no sense controlling on the question now before this court.

The proposition conceded by all—that, if the Postmaster General committed an error of law, this court should enjoin the enforcement of the fraud order—is made the basis of an attack thereon by complainant's counsel. It is urged that, if the evidence on which the fraud order was issued was meager, or lacking, that then the Postmaster General committed an error of law. There is no authority to sustain the contention in any of the reported cases. To sustain such a contention would be equivalent to a writ of error from this court to review the decisions of that officer on the ground that his findings are not supported by the evidence. But he did have evidence before him. That evidence may or may not have been legal evidence according to the standard of the text-books. It may have been hearsay. It may have been secondary. It may have been delivered by an incompetent witness. Or it may have been such as the courts would receive. But, whatever it was, it was evidence satisfactory to him. And it is no sufficient reason to urge that by denying the injunction an injustice may be done the bank. As to that this court cannot say. It may be that to issue the injunction an injustice would be done those already interested in the bank and that innumerable number of people who are at all times trying to get into concerns they know nothing about, and then soon try to get out. The Postmaster General in the case at bar moved with caution. He was aided at all steps by the assistant attorney general for that department. He was then advised by opinion by the Attorney General of the United States. Upon such a hearing it was that the "fraud order" was issued. And the results of such a hearing cannot be, and should not be, decreed inoperative by a court. If this be not so, then in every case there must be a hearing by the courts, thereby usurping the prerogatives of the executive department of this government. And one must have considerably less faith in this government than I have to seriously believe that we are confronted with an impending danger of a tyrannical censorship over legitimate correspondence. The Postmaster General had, under the power with which he is clothed, the right to investigate the subject-matter. It was his right and duty to ascertain whether the methods of the bank were to further a scheme by the use of the mails to obtain money by fraudulent means. His findings of fact were that such practices were carried on. He had the power to act. He committed no error of law, and his findings of fact are not open to inquiry by the courts.

The restraining order heretofore issued is vacated, and the writ of injunction prayed for is denied.